DREWS et al. *v.* MARYLAND.

No. 1010.  Decided June 1, 1965.

*Francis D. Murnaghan, Jr.,* for appellants.

*Thomas B. Finan,* Attorney General of Maryland, and *Robert C. Murphy,* Deputy Attorney General, for appellee.

Per Curiam.

The motion to dismiss is granted and the appeal is dismissed for want of jurisdiction.  Treating the papers whereon the appeal was taken as a petition for writ of certiorari, certiorari is denied.

Mr. Chief Justice Warren, with whom Mr. Justice Douglas joins, dissenting from the denial of certiorari.[1]

On Sunday, September 6, 1959, Juretha Joyner and James L. Lacey, who are Negroes, and Helen W. Brown, Dale H. Drews and Joseph C. Sheeham, who are white, went to Gwynn Oak Park, an amusement park in Baltimore County, Maryland.  Ironically, the park was celebrating "All Nations Day."  Shortly after 3 p. m. they

---

[1] I agree with appellee that this is not a proper appeal.  However, in 28 U. S. C. § 2103 (1958 ed., Supp. V), Congress has provided, in pertinent part:

"If an appeal to the Supreme Court is improvidently taken from the decision of the highest court of a State, or of a United States court of appeals, in a case where the proper mode of a review is by petition for certiorari, this alone shall not be ground for dismissal; but the papers whereon the appeal was taken shall be regarded and acted on as a petition for writ of certiorari and as if duly presented to the Supreme Court at the time the appeal was taken."

were standing in a group by themselves and had, a park guard testified, attracted no attention from other patrons. The guard approached the group and told them that "we are very sorry but the park was closed to colored, and that the colored people would have to leave the premises . . . ." Mr. Lacey answered that he was enjoying himself and would like to look around some more, and neither he nor Miss Joyner complied with the request to leave. The guard then asked all five to leave, but they refused. He testified, however, that they "were all very polite." During this interchange between the guard and petitioners, other patrons of the park began to gather around.

Upon the refusal of petitioners to leave, the guard summoned the Baltimore County police, who, after asking petitioners to leave, placed them under arrest. Meanwhile, the crowd surrounding the petitioners grew larger and more hostile, even going so far as to kick, spit, and yell "Lynch them!" Neither the park officials nor the county police made any attempt to exclude from the park or arrest any of those who engaged in such conduct. Upon being informed of their arrest, the five joined arms briefly, and the three men then dropped to the ground and assumed a prostrate position. Petitioners Joyner and Brown remained on their feet. The police placed handcuffs on Miss Joyner, and escorted her and Miss Brown from the park. Though the police encountered some difficulty in pulling the women through the crowd, they left under their own power. The men, on the other hand, had to be carried out, but offered no active resistance. The only remark by any of the petitioners was made by one of the men, who, responding to mistreatment by someone in the crowd, said ". . . forgive him, he doesn't know what he is doing . . . ."

On April 5, 1960, petitioners Brown, Joyner, Drews and Sheeham were charged with "acting in a disorderly manner, to the disturbance of the public peace, at, in

or on Gwynn Oak Amusement Park, Inc., a body corporate, a place of public resort and amusement in Baltimore County" in violation of Md. Code Ann. Art. 27, § 123 (1957 ed.).[2] Mr. Lacey was not prosecuted. Petitioners waived jury trial, were found guilty by the court, and each was fined $25 plus costs.[3] On January 18, 1961, the Maryland Court of Appeals, defining disorderly conduct as "the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area,"[4] affirmed the convictions. 224 Md. 186, 192, 167 A. 2d 341, 343–344. On June 22, 1964, this Court vacated the judgments and remanded the case to the Court of Appeals for consideration in light of *Griffin* v. *Maryland,* 378 U. S. 130, and *Bell* v. *Maryland,* 378 U. S. 226. 378 U. S. 547. On remand, the Court of Appeals, purporting to distinguish *Griffin* and *Bell,* reinstated and reaffirmed the prior judgments of conviction, Judge Oppenheimer dissenting. 236 Md. 349, 204 A. 2d 64.

I cannot concur in the Court's refusal to review this case. (1) There is in my mind serious question as to whether the conduct of petitioners can constitutionally be punished under a disorderly conduct statute. (2) It

---

[2] Section 123 provides, in pertinent part:

"Drunkenness and disorderly conduct generally; habitual offenders.

"Every person who shall be found drunk, or acting in a disorderly manner to the disturbance of the public peace, [in any of a number of specified locations, including places of public resort or amusement] shall be deemed guilty of a misdemeanor; and, upon conviction thereof, shall be subject to a fine of not more than fifty dollars, or be confined in jail for a period of not more than sixty days or be both fined and imprisoned in the discretion of the court. . . ."

[3] This Court has never (and I hope it never does) let the fact that the criminal penalty is relatively small stand in the way of reviewing a case presenting important constitutional questions. *E. g., Thompson* v. *Louisville,* 362 U. S. 199, 203–204 ($10 fine); *Yick Wo* v. *Hopkins,* 118 U. S. 356 ($10 fine).

[4] Compare *Cox* v. *Louisiana,* 379 U. S. 536, 551–552.

seems to me apparent from the record that petitioners' conduct is protected under the Civil Rights Act of 1964, 78 Stat. 241, and that, under our decision in *Hamm* v. *City of Rock Hill* and *Lupper* v. *Arkansas*, 379 U. S. 306, the passage of the Act must be deemed to have abated the convictions.

## I.

In *Thompson* v. *Louisville*, 362 U. S. 199, the only evidence supporting the petitioner's disorderly conduct conviction was to the effect that, after being arrested on another charge, he was "very argumentative" with the arresting officers. We set aside the conviction on the ground that it was "so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment." *Ibid.* *Thompson* was followed in *Garner* v. *Louisiana*, 368 U. S. 157, where the evidence showed that the petitioners, who were Negroes, had taken seats at a lunch counter where only white people were served, and had refused to leave upon request. For this they were convicted of disturbing the peace. For purposes of our decision, we gave the statute under which the petitioners were convicted its broadest possible readings, and assumed that it outlawed even peaceful and orderly conduct which foreseeably might cause a public commotion, *id.*, at 169. Nonetheless, we found the petitioners' conduct constitutionally insufficient to support the conviction.[5] And in *Barr* v. *City of Columbia*, 378 U. S. 146, we reversed a breach of the peace conviction based on conduct

---

[5] In *Garner* the Court noted that the record did not support the allegation that the trial judge had taken judicial notice of the fact that the petitioners' presence in a segregated establishment was likely to cause a disturbance. 368 U. S., at 173. Neither the trial transcript in the instant case nor the trial judge's memorandum opinion indicates that he took that sort of notice here.

similar to that involved in *Garner*. In doing so, we observed that

> "because of the frequent occasions on which we have reversed under the Fourteenth Amendment convictions of peaceful individuals who were convicted of breach of the peace because of the acts of hostile onlookers, we are reluctant to assume that the breach-of-peace statute covers petitioners' conduct here. . . . Since there was no evidence to support the breach-of-peace convictions, they should not stand." *Id.*, at 150–151.

I do not find this case meaningfully distinguishable from *Garner* and *Barr*. Clearly, nothing petitioners did prior to being placed under arrest could be called disorderly conduct: their only "sins" up to that point were being Negro or being in the company of Negroes, and politely refusing to leave the park. Nonetheless, they were arrested. *Then* all five members of the group briefly linked arms, and, in a further show of passive resistance, the three men dropped to the ground. They did not, the police officers testified, offer anything in the way of active resistance to either arrest or ejection. As Judge Oppenheimer observed: "In resisting the command of the officers to leave the park, the defendants used no force against the officers or anyone else; they held back or fell to the ground." 236 Md., at 355, 204 A. 2d, at 68. Nor did they argue with the police, cf. *Thompson* v. *Louisville, supra,* or use profanity, cf. *Sharpe* v. *State,* 231 Md. 401, 190 A. 2d 628, cert. denied, 375 U. S. 946; indeed, the only words spoken were in the nature of a plea for forgiveness of one of the mob. All they did was refuse to assist in their own ejection from a segregated amusement park.

The two women did not even lie down. The only bit of testimony from which the trial judge could possibly have inferred disorderly behavior is the following:

> "Q. Now, Officer, do you always place handcuffs on persons whom you have arrested?

"A. When I have a little trouble getting them through the Park or any—when I have a little trouble with them, yes.

"Q. What trouble did you have with Juretha Joyner?

"A. By refusing to leave.

"Q. Did you place handcuffs on any of the other Defendants?

"A. No, I don't recall.

"Q. Did you or did you not?

"A. No, sir.

"Q. Now, did the two female Defendants leave the Park, did they leave under their own power?

"A. I had to pull them through the crowd.

"Q. They walked out?

"A. They walked out, but I had to pull them through.

"THE COURT: Why did you have to pull them through?

"A. Because they didn't want to leave voluntarily.

"Q. They came when you pulled?

"A. They did, yes, sir."

There is undoubtedly some truth to the officer's surmise; I am sure neither woman liked being ejected from the park solely because of her race or the race of her friend. I suspect that their reluctance also resulted in no small measure from a fear of being pulled through a shouting, spitting, kicking mob.

Even if it be assumed that the arrest of petitioners was lawful,[6] I have great difficulty distinguishing the conduct

---

[6] It is far from clear that the arrest was lawful. In view of the fact that § 24–13 of the Baltimore County Code (1958) authorizes the appointment of special police officers "for the proper protection of persons and property in the county," it may well be that the guard who asked petitioners to leave the park enjoyed the same status as the officer involved in *Griffin* v. *Maryland*, 378 U. S. 130. When this case was here the first time, we remanded it for consideration in light of

of the women, and, to a lesser extent, that of the men, from the refusals to leave segregated establishments which were before us in *Garner* and *Barr*. I cannot see how a statute outlawing "drunkenness and disorderly conduct" [7] can be said to have given petitioners fair warning, cf. *Bouie* v. *City of Columbia*, 378 U. S. 347, that the conduct (or, in the case of the women, lack of conduct) in which they engaged was criminally punishable.[8] I cannot, at

*Griffin.* However, only Judge Oppenheimer, dissenting, drew from our remand the meaning that, until today, I too had thought it was supposed to carry, and voted to remand the case to the trial court for an investigation of the relation between the guard and the county:

"If Wood, the 'special officer' in this case, had virtually the same authority from Baltimore County that Collins [the guard involved in *Griffin*] had from Montgomery County . . . then under *Griffin* v. *Maryland, supra,* the State was a joint participant in the discriminatory action.

.        .        .        .        .

"The Baltimore County Code authorizes the county to appoint special police officers to serve for private persons or corporations. Baltimore County Code, Sections 24–13 and 35–3 (1958). I would remand this case to the Circuit Court for Baltimore County for the taking of additional testimony to determine whether or not Wood was appointed by Baltimore County under these sections of its Code. If he was, the convictions should be reversed." 236 Md., at 355; 204 A. 2d, at 68 (Oppenheimer, J., dissenting).

Thus we still do not know whether the guard's action constituted state action, thereby rendering his command to leave the park unconstitutional. Yet it is axiomatic that "one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." *Wright* v. *Georgia,* 373 U. S. 284, 291–292. Moreover, a strong argument can be made that, under Maryland law, resisting an unlawful arrest does not constitute disorderly conduct. See *Sharpe* v. *State,* 231 Md. 401, 403, 404, 190 A. 2d 628, 630, cert. denied, 375 U. S. 946.

[7] With the conduct of petitioners herein, compare that of the defendants in *Sharpe* v. *State, supra,* note 6, and *In re Cromwell,* 232 Md. 409, 194 A. 2d 88. Also, compare *Niemotko* v. *State,* 194 Md. 247, 250, 71 A. 2d 9, 10, with *Niemotko* v. *Maryland,* 340 U. S. 268, 271.

[8] Whether or not petitioners' conduct would support a conviction for something other than disturbing the peace I do not know. Nor

least not without argument and full consideration by the Court, join in letting stand a decision which holds that police can arrest persons who are doing nothing remotely disorderly, secure in the knowledge that if the persons refuse wholeheartedly to cooperate in their own arrest and removal to a waiting squad car, their conviction for disorderly conduct will be forthcoming.[9]

## II.

In *Hamm* v. *City of Rock Hill* and *Lupper* v. *Arkansas,* 379 U. S. 306, 308, we held:

> "The Civil Rights Act of 1964 forbids discrimination in places of public accommodation and removes peaceful attempts to be served on an equal basis from the category of punishable activities. Although the conduct in the present cases occurred prior to enactment of the Act, the still-pending convictions are abated by its passage."

The convictions in this case did not become final until today. That the amusement park is an establishment covered by § 201 of the Civil Rights Act, 78 Stat. 241, 243, seems clear.[10] I take it, therefore, that the Court

---

do I inquire, for "[c]onviction upon a charge not made would be sheer denial of due process." *De Jonge* v. *Oregon,* 299 U. S. 353, 362. See also *Garner* v. *Louisiana,* 368 U. S. 157, 164; *Thompson* v. *Louisville,* 362 U. S. 199, 206; *Cole* v. *Arkansas,* 333 U. S. 196, 201.

[9] It seems to me that the persons who were in fact guilty of disorderly conduct were the members of the crowd; however, none of them was prosecuted.

[10] There is a restaurant at Gwynn Oak Park; indeed, petitioners were standing next to it when they were arrested. If a substantial portion of the food served in that restaurant has moved in interstate commerce, the entire amusement park is a place of public accommodation under the Act. §§ 201 (b) (2), 201 (b) (4), 201 (c). See also § 201 (b) (3). If the Court were unwilling to assume that the restaurant serves a substantial portion of such food, the proper course would be to remand the case for a hearing on the issue. Since the Court denies certiorari, I assume that it is for some other reason that it

does not regard petitioners' conduct as a "peaceful attempt to be served on an equal basis." I cannot agree. Surely the attempt to be served was completely orderly, and, as I indicated above, I think petitioners' post-arrest conduct amounted to no more than a natural and fully understandable reaction to their arbitrary exclusion from the park.

In two recent decisions, we have, rightly in my opinion, recognized that people denied service because of their race are likely to react with less than wholehearted cooperation. Today, I fear, the Court forgets that elemental principle of human conduct, and demands, on pain of criminal penalty, the patience of Job. In *Blow* v. *North Carolina,* 379 U. S. 684, the evidence adduced at trial showed that the petitioners, two Negroes, were refused service in a restaurant, whereupon one proceeded to sit down on the floor mat outside the door, and the other stood near the door. They were convicted under a statute making it a crime to enter upon the lands of another without a license after being forbidden to do so. We held that the Civil Rights Act abated their convictions. In *McKinnie* v. *Tennessee,* 380 U. S. 449, the petitioners, eight Negroes, entered the vestibule of a restaurant, were refused entrance into the restaurant proper, whereupon they remained in the vestibule, which measured 6′ x 6′ 4″, for approximately 20 minutes. There was testimony that the petitioners had engaged in some pushing and shoving, but the evidence was unclear as to whether the pushing was initiated by the Negroes or was attributable to white people who, during the 20 minutes, entered the restaurant through the vestibule. Again, we held that the convictions (for conspiracy to injure trade or commerce) had been abated by the passage of the Civil Rights Act. In

---

regards petitioners' conduct as not protected by the Act. I further assume that the fact that three of the petitioners are white is not the decisive factor, cf. *Walker* v. *Georgia, ante,* p. 355, since certiorari is denied as to the Negro petitioner too.

each case we concluded that the conduct of the petitioners constituted no more than a peaceful refusal to acquiesce in a denial of their federal rights.   I think we should draw the same conclusion here.

In dissenting, I of course do not suggest that a civil rights demonstrator, or anybody else, has a right to block traffic, or bar access to a man's home or place of business. I fully concur in the Court's observation in *Cox* v. *Louisiana,* 379 U. S. 536, 554–555:

> "The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.   The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order.   A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.   One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest.   Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly.   Governmental authorities have the duty and responsibility to keep their streets open and available for movement.   A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

But such examples are a far cry from what happened here. Juretha Joyner, a Negro, went with some friends to celebrate "All Nations Day" at Gwynn Oak Park.   Despite the facts that she behaved with complete order and dig-

nity, and that her right to be at the park is protected by federal law, she was asked to leave, solely because of her race. She refused and, upon being handcuffed, displayed some reluctance (though no active resistance) to being pulled through an actively hostile mob. For this she was convicted of "acting in a disorderly manner, to the disturbance of the public peace." Today the Court declines to review her conviction, and the convictions of her three companions. I cannot join.