**Mrs. Doris DANIEL and Mrs. Rosalyn Kyles, Appellants,**

v.

**Euell PAUL, Jr., Individually and as Owner, Operator or Manager of Lake Nixon Club, Appellee.**

No. 18824.

United States Court of Appeals Eighth Circuit.

May 3, 1968.

Rehearing Denied June 10, 1968.

Before VAN OOSTERHOUT, Chief Judge, and MEHAFFY and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

Doris Daniel and Rosalyn Kyles, plaintiffs-appellants, Negro citizens and residents of Little Rock, Pulaski County, Arkansas, were refused admission to the Lake Nixon Club, a recreational facility located in a rural area of Pulaski County and owned and operated by the defendant-appellee Euell Paul, Jr. and his wife, Oneta Irene Paul. Plaintiffs brought this suit seeking injunctive relief from an alleged discriminatory policy followed by defendant denying Negroes the use and enjoyment of the services and facilities of the Lake Nixon Club.[1] This suit was brought as a class action under Title II of the Civil Rights Act of 1964, P.L. 88–352, § 201 et seq., 78 Stat. 243 et seq., 42 U.S.C. § 2000a et seq., alleging that the Lake Nixon Club is a "public accommodation" as the term is defined in the Act, and that, therefore, it is subject to the Act's provisions.

For the purpose of trial this case was consolidated with a similar suit brought by plaintiffs against Spring Lake Club, Inc. The trial was to Chief District Judge Henley who held that neither Lake Nixon Club nor Spring Lake, Inc. was a "public accommodation" as defined in and covered by Title II of the Civil Rights Act of 1964, and ordered dismissal of the complaints. We are concerned solely with the court's decision with regard to Lake Nixon Club, since there was no appeal from the portion of the decision regarding Spring Lake, Inc. Chief Judge Henley's memorandum opinion is published at 263 F.Supp. 412. We affirm.

The plaintiffs alleged in their complaint that the Lake Nixon Club is a place of public accommodation within the meaning of 42 U.S.C. § 2000a et seq; that it serves and offers to serve interstate travelers; that a substantial portion of the food and other items which it serves

Norman C. Amaker, New York City, for appellants; John W. Walker, Little Rock, Ark., and Jack Greenberg and Michael Meltsner and Gabrielle A. Kirk, New York City, were on the brief.

Sam Robinson, of Robinson, Thornton, McCloy & Young, Little Rock, Ark., for appellee.

1. At the trial, an oral amendment was made and accepted making Mrs. Paul a party to the action.

and uses moves in interstate commerce; that its operations affect travel, trade, commerce, transportation, or communication among, between and through the several states and the District of Columbia; that the Lake Nixon Club is operated under the guise of being a private club solely for the purpose of being able to exclude plantiffs and all other Negro persons; and that the jurisdiction of the court is invoked to secure protection of plaintiffs' civil rights and to redress them for the deprivation of rights, privileges, and immunities secured by the Fourteenth Amendment to the Constitution of the United States, Section 1; the Commerce Clause, Article I, Section 8, Clause 3 of the Constitution of the United States; 42 U.S.C. § 1981, providing for the equal rights of citizens and all persons within the jurisdiction of the United States; and Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U.S.C. § 2000a et seq., under which they allege that they are entitled to an injunction restraining defendant from denying them and others similarly situated admission to and full use and enjoyment of the "goods, services, facilities, privileges, advantages, and accommodations" of the Lake Nixon Club.

The defendant denied that Lake Nixon is a place of public accommodation within the meaning of the Act; denied that Lake Nixon serves or offers to serve interstate travelers or that a substantial portion of the food and other items which it serves and uses moves in interstate commerce; denied that its operations affect travel, trade, commerce, transportation or communication between and through the several states and the District of Columbia within the meaning of the Act; and, further answering, averred that defendant operates Lake Nixon Club as a place to swim; that he has a large amount of money invested in the facility; that if he is compelled to admit Negroes to the lake, he will lose the business of white people and will be compelled to close his business; that the value of his property will be destroyed; and that he will be deprived of his rights under the Fourteenth Amendment to the Constitution of the United States.

The provisions of the Civil Rights Act of 1964 which define "a place of public accommodation" as covered by the Act, and which plaintiffs contend bring the Lake Nixon Club within its coverage, are contained in 42 U.S.C. § 2000a(b), and provide as follows:

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter *if its operations affect commerce*, or if discrimination or segregation by it is supported by State action:

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment." (Emphasis added.)

It will be noted that an establishment falling in any of the four categories out-

lined above is covered by the Act only "if discrimination or segregation by it is supported by State action," which is not contended here, or "if its operations affect commerce." The criteria for determining whether an establishment affects commerce within the meaning of the Act are set forth in 42 U.S.C. § 2000a (c), as follows:

"(c) The operations of an establishment affect commerce within the meaning of this subchapter if (1) it is one of the establishments described in paragraph (1) of subsection (b) of this section; (2) in the case of an establishment described in paragraph (2) of subsection (b) of this section, it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b) of this section, it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between

points in the same State but through any other State or the District of Columbia or a foreign country."

The facts in the case are relatively simple and not in material dispute. The Lake Nixon property, consisting of 232 acres, is located on a country road several miles from the City of Little Rock and is not close to any state or federal highway. In 1962 Paul and his wife purchased this property, and since that time they have made their home there and operated the facility for recreational purposes. In 1964 they adopted a club plan in order to prevent undesirables from using the facility, with no thought of simply excluding Negroes, as no Negro had ever sought admission.[2] A membership fee of 25¢ per person per season was charged. The only Negroes who ever sought admission were the two plaintiffs and a young Negro man who accompanied them to Lake Nixon on July 10, 1966. When they sought to use the facilities, Mrs. Paul told them that the membership was filled, but candidly testified at the trial that their admission was denied because of their race. In response to written interrogatories propounded to Mr. Paul in a discovery deposition, he replied that he and his wife exercised their own judgment in accepting applicants for membership and refused those whom they did not want. Referring to the plaintiffs, Mr. Paul stated:

"At that time, we refused admission to them because white people in our community would not patronize us if we admitted Negroes to the swimming pool. Our business would be ruined and we have our entire life savings in it."

Mr. and Mrs. Paul invested $100,000.00 in the property, and, although it is op-

---

2. In this regard, Mrs. Paul testified as follows:

"Q. Now, what do you have out there, Mrs. Paul, by way of facilities for the people that come out there; do you operate it as a club?

"A. Yes, we do, we operate it as a club.

"Q. Now, at the time you put this on a club basis did you do it for the purpose of excluding Negros?

"A. Well, no, because there had never been any out there; it was five miles to the closest Negro addition; and it was really the last thing on our mind at the time; we had to do it to eliminate undesirables."

erated only during the swimming season—from some time in May until early September depending upon the weather —it has earned a substantial and comfortable livelihood for them, producing net profits in excess of $17,000.00 annually.

Plaintiff Mrs. Doris Daniel, who lived in Little Rock some twelve miles from Lake Nixon, was the only witness who testified on behalf of the plaintiffs. The other evidence is incorporated in pretrial answers to interrogatories and the testimony of Mr. and Mrs. Paul. Mrs. Daniel testified that she was employed as a secretary for Christopher C. Mercer, Jr. She further testified that she went to Lake Nixon Club on about July 10, 1966, accompanied by a girl friend, Rosalyn Kyles, the other plaintiff, and a male acquaintance. She told the attendant at the admission window that they would like to come in but was advised that they would have to wait and see the lady in the next room. Mrs. Paul was the lady to whom they were referred, and Mrs. Daniel testified that "she asked if we were members; and we stated we weren't; she said we would have to be members to come in; and we asked to get application to apply for membership and she said I'm sorry, but we're filled up." This witness had never been to Lake Nixon before and testified that she had heard the advertising on the radio and people talking about it and went out to look it over, and perhaps participate in some of the activities. She took her swimming suit with her.

While the principal attraction at Lake Nixon is swimming, the facility also had, at the time of the trial of this case, fifteen aluminum paddle boats available for rent, two coin-operated juke boxes, and a miniature golf course. Also operated in connection with the business was a snack bar which offered for sale hamburgers, hot dogs, milk and soft drinks, but did not stock or sell coffee, tea, cigars, cigarettes, sugar or beer. On Friday nights there usually would be a dance at Lake Nixon with "live music" furnished by young musicians from the Little Rock area who were amateurs and also patrons of the facility. There is no evidence that they ever played outside this immediate locality, but to the contrary the undisputed evidence indicates that they did not.[3]

Mr. Paul further stated in response to interrogatories that during the preceding twelve months the Lake Nixon Club had advertised only twice in a paper or magazine—one time in May in a local monthly magazine entitled "Little Rock Today," and one time in June in a monthly paper published at the Little Rock Air Force Base. Announcements of the dances were also made on a local radio station, inviting members of the club to attend.[4]

3. Mr. Paul testified on cross-examination as follows:

"Q. Now, did you have bands out at your place on the week ends?
"A. Yes.
"Q. Were they local bands?
"A. Yes.
"Q. Do you know whether those bands happened to play in Jacksonville?
"A. No.
"Q. You really don't know where they played, do you?
"A. Yes, I'm pretty certain they played just right here in Little Rock.
"Q. Just for you; what band was it?
"A. Well, we had the Romans, the Loved Ones. I can't remember the names of all—

"Q. You had a lot of different bands?
"A. Yes.
"Q. How can you be sure that they just played in Little Rock?
"A. Because they were members there and were frequently out there; they mostly worked in town and this was a hobby; they were not professionals."

4. Mr. Paul testified as follows:
"Q. Did you advertise for persons to come and make use of the facilities during the summer?
"A. Members only.
  *    *    *    *    *
"A. Our opening statement was basically, well, specifically stated that it was for members only.

The food business at Lake Nixon was minimal. According to the stipulation of the parties, the net income from food and concession sales was only $1,412.62 for the entire 1966 season. There were an estimated 100,000 admissions to Lake Nixon during the season and the food sold there was a minor and insignificant part of the business. The testimony was that the club was not in the food business but merely had the snack bar as a necessary adjunct to serve those who wished to refresh themselves during an afternoon or evening of participation in the various forms of recreation offered—swimming, boating, miniature golfing, or dancing.[5]

The district court found that Lake Nixon was not a private club but was simply a privately owned accommodation operated for profit and open in general to all members of the white race. The court further found that the defendants were excluded on account of their race but that the Lake Nixon Club did not fall within any of the four categories designated by Congress as "public accommodations" which affect commerce within the meaning of the Civil Rights Act of 1964, and, therefore, the Club was not subject to its provisions. We agree with the court's conclusion.

Plaintiffs do not contend that Lake Nixon falls within the first category pertaining to inns, hotels, motels, etc. They do, however, contend that the three remaining categories bring it within the Act.

As hereinbefore pointed out, the second category includes "any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises," if its operations affect commerce, but not otherwise. In determining whether its operations affect commerce, we must look to 42 U.S.C. § 2000a(c), which provides that the operations of an establishment affect commerce within the meaning of this subchapter in the case of an establishment described in paragraph (2) of subsection (b), if it "serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce."

The trial court found that there was no evidence that the Lake Nixon Club has ever tried to attract interstate travelers as such, and that the location of the facility is such that it would be of the highest degree unlikely that an interstate traveler would break his trip for the purpose of utilizing its facilities, it being located on a country road remote from either a federal or a state highway. With regard to the food served, the trial court reasoned that since the second category consists of establishments "principally engaged" in the sale of food for consumption on the premises and since food sales are not the principal business of the Lake Nixon Club, it would not be included in the second category. In this connection, the court held that the Lake Nixon Club was a single unitized operation, with the sale of food and drink being merely adjuncts to the principal business of making recreational facilities available to the public, and that, therefore, it would not come within the fourth

---

"Q. For members only?
"A. Yes."
Mrs. Paul testified as follows:
"Q. I believe there has been some evidence introduced of the ads you had over the radio, were those ads addressed to members of the club?
"A. Members of Lake Nixon.
"Q. To members of Lake Nixon?
"A. To all members of Lake Nixon it usually ran."

5. Mr. Paul testified on cross-examination as follows:
"Q. But sales from sandwiches and the like did account for a large degree of your gross sales; is that true?
"A. No, very minor what we make off of that; food was just a commodity to have there for the peole if they wanted it; I mean we were not in the food business—there was no restaurant —it was just a necessity."

category making the Act applicable to an establishment otherwise covered or within the premises of which is physically located any such covered establishment.

With regard to whether a substantial portion of the food which Lake Nixon serves has moved in commerce, the trial court found that food and soft drinks were purchased locally by the Club but noted that the record before the court did not disclose where or how the local suppliers obtained the products. The court further observed that the meat products sold by the defendants may or may not have come from animals raised, slaughtered, and processed in Arkansas. It also made an observation that the bread used in the sandwiches was baked and packaged locally but took judicial notice that the principal ingredients going into the bread were produced and processed in other states. This observation on the part of the court, however, was entirely voluntary, and the ingredients in the bread would not constitute a substantial part of the food served. We might add that it is a matter of common knowledge that Borden's of Arkansas, which the record shows supplied the milk, obtains the unprocessed milk for its local plant from Arkansas dairy farmers.

Looking to the legislative history of the Civil Rights Act for an indication regarding what the proponents of the bill intended by the use of the word "substantial" in § 2000a(c), we note that Robert F. Kennedy, who was then Attorney General, expressed the opinion in the hearings on S. 1732 before the Senate Committee on Commerce that the word "substantial" means "more than minimal." Codogan v. Fox, 266 F.Supp. 866, 868 (M.D.Fla.1967). In Newman v. Piggie Park Enterprises, Inc., 256 F.Supp. 941 (D.S.C.1966), rev'd on other grounds, 377 F.2d 433 (4th Cir.1967), cert. granted, 389 U.S. 815, 88 S.Ct. 87, 19 L.Ed.2d 66, the court held that where the evidence showed that at least 40% of the food moved in commerce, this was a "substantial" portion under a construction of the word in its usual and customary meaning, which the court defined as follows: "something of real worth and importance; of considerable value; valuable; something worthwhile as distinguished from something without value or merely nominal." In the *Newman* case, the district court held that the five drive-in restaurants belonging to Piggie Park Enterprises, Inc., all of which were located on or near interstate highways, were not covered by the Act because the evidence showed that less than 50% of the food was eaten on the premises, but the Fourth Circuit Court of Appeals reversed, holding that the test in construing this provision of the Act was not whether a principal portion of the food was actually consumed on the premises but whether the establishment was principally engaged in the business of selling food ready for consumption on the premises.

In Willis v. Pickrick Restaurant, 231 F.Supp. 396 (N.D.Ga.1964), where the restaurant had annual gross receipts from its operations of over $500,000.00 for the preceding year and its purchases of food exceeded $250,000.00, the court found that a substantial part of this large amount of food originated from without the state and that, therefore, it affected commerce. Furthermore, while there was little evidence that it actually served interstate travelers, the evidence was clear that it offered to serve them by reason of the fact that it had large signs on two federal highways, and the restaurant itself was on the main business route of U. S. 41, a federal interstate highway.

In Gregory v. Meyer, 376 F.2d 509 (5th Cir. 1967), the court held that the question of the amount of food served in a restaurant which has moved in interstate commerce is a relative one and that the drive-in there involved, which had an annual sales of about $71,000.00, of which approximately $5,000.00 resulted from the sale of coffee and tea which had moved in interstate commerce, and which derived two-thirds of its sales volume from beef products which came from a meat packer who purchased twenty to thirty per cent of his cattle from another

state, was covered by the Act. Furthermore, the drive-in in the *Gregory* case was located only three blocks from a federal highway, on a street which was an extension of the highway, and the court found that it was engaged in offering to serve interstate travelers.

The case of Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), is likewise distinguishable. The Supreme Court there stated at page 298, 85 S.Ct. at page 380: "In this case we consider its [the Act's] application to restaurants which serve food a substantial portion of which has moved in commerce." The restaurant there was located on a state highway, eleven blocks from an interstate highway, and evidence was introduced that 46% of the food served was meat which had been procured from outside the state.

The case of Evans v. Laurel Links, Inc., 261 F.Supp. 474 (E.D.Va.1966), cited by plaintiffs, is likewise factually inapposite. In the *Evans* case, it was stipulated that a portion of the food served moved in interstate commerce and that each year out-of-state teams participated in team matches; further, that the golf shop sold golf equipment, most of which was manufactured outside the state and had moved in interstate commerce. The court found that the lunch counters at Laurel Links served and offered to serve interstate travelers and also that the defendant customarily presented athletic teams which moved in commerce, thereby bringing it under subsection (b), paragraph (3) and subsection (c) of 42 U.S.C. § 2000a. The court there said at page 477: "The Act applies because an out-of-state team plays on the defendant's course on a regularly scheduled annual basis."

In the record before us, there is a total lack of proof that Lake Nixon Club served or offered to serve interstate travelers or that a substantial portion of the food

which it served moved in interstate commerce. Therefore, all of the cases cited by the parties are distinguishable inasmuch as there is not a word of record testimony here that would justify a conclusion that the concession stand engaged in or offered to engage in any business affecting commerce. The same can be said with respect to the recreational facilities at Lake Nixon. There is not one shred of evidence that Lake Nixon customarily presented any activity or source of entertainment that moved in interstate commerce.

The evidence here is that Lake Nixon is a place for swimming and relaxing. While swimming is the principal activity, it does have fifteen aluminum paddle boats which are leased from an Oklahoma-based company and a few surf boards. It is common knowledge that annually thousands of this type boat are manufactured locally in Arkansas, and there is no evidence whatsoever that any of the equipment moved in interstate commerce. Furthermore, we do not interpret the law to be that coverage under the Act extends to businesses because they get a portion of their fixtures and/or equipment from another state. Otherwise, the businesses which the Act's sponsors and the Attorney General of the United States specifically said were not covered would be included in the coverage.[6] There were two juke boxes obtained from a local amusement company which provided music upon the insertion of a coin. As hereinbefore stated, there usually would be a dance on Friday nights if the weather was good, and the dances were sometimes advertised on a local radio station, apprising the members concerning the dance and inviting them to attend.

When the juke boxes were not utilized at the Friday night dances, a small band was provided but it was composed of local young amateurs and members of the

---

6. Senator Magnuson, floor manager of Title II, said that dance studios, bowling alleys and billiard parlors would be exempt, 110 Cong.Rec. 7406 (4/9/64); Miller v. Amusement Enterprises, Inc., 391 F.2d 86 (5th Cir. 1967).

Club, and there is no evidence whatsoever that they ever played outside Pulaski County. Such operations do not affect commerce under the definition of the statute which makes coverage applicable if the operation "customarily presents films, performances, athletic teams, exhibitions or other sources of entertainment which move in commerce." It was clearly not the intention of the Congress to include this type of recreation within the coverage of the Act, but, even if it should be construed as entertainment within the definition of the Act, it did not move in commerce and consequently is not proscribed.

The Civil Rights Act of 1964, as everyone knows, is a compromise act. It was not intended to be all inclusive, and, in this regard Senator Humphrey, a leading proponent of the bill, stated:

"The reach of that title [H.R. 7152] is much narrower than when the bill was first introduced. It is also narrower than S. 1732, the bill reported by the Senate Commerce Committee, which covers the general run of retail establishments. * * * The deletion of the coverage of retail establishments generally is illustrative of the moderate nature of this bill and of its intent to deal only with the problems which urgently require solution." 110 Cong. Rec. 6533.[7]

Additionally, Senator Humphrey stated:

"Of course, there are discriminatory practices not reached by H.R. 7152, but it is to be expected and hoped that they will largely disappear as the result of voluntary action taken in the salutory atmosphere created by enactment of the bill." 110 Cong.Rec. 6567.[8]

Senator Magnuson, who was floor manager of Title II, discussed this title in detail and said:

"The types of establishments covered are clearly and explicitly described in the four numbered subparagraphs of section 201(b). An establishment should have little difficulty in determining whether it falls in one of these categories. * * * Similarly, places of exhibition and entertainment may be expected to know whether customarily it (sic) presents sources of entertainment which move in commerce." 110 Cong.Rec. 6534.[9]

A section-by-section analysis of S. 1732 appears in 2 U.S.Cong. & Adm.News '64 at pages 2356 et seq. In a paragraph concerning subsection 3(a) (2), it was stated:

"This subsection would include all public places of amusement or entertainment which customarily present motion pictures, performing groups, athletic teams, exhibitions, or *other sources of entertainment which move in interstate commerce.*" (Emphasis added.)

We have no disagreement with the trial court's rationale or with its utilization of the rule of *ejusdem generis* in arriving at its conclusion, but our view is that subsection (c) of the statute so plainly defines the operations that affect commerce that it is obvious that Lake Nixon's activities are not proscribed by the Act. Plaintiffs' argument that the Act applies is based on the false premise that a "substantial portion of the food sold has traveled through interstate commerce," which is wholly unsupported by the evidence. Treating this false assumption as a fact, plaintiffs then conclude that "the operation of the snack bar affects commerce within the meaning of § 201(c) (2) of Title II."

In Miller v. Amusement Enterprises, Inc., 391 F.2d 86 (5th Cir. 1967), the panel requested the United States, acting through its Civil Rights Division in the Department of Justice, to file with the court its brief setting

---

7. This extract is taken from the legislative history furnished the Fifth Circuit by the Civil Rights Division of the Department of Justice and attached to the opinion in Miller v. Amusement Enterprises, Inc., supra.

8. See n. 7.

9. See n. 7.

forth the legislative history of these provisions insofar as pertinent. The response of the Civil Rights Division is attached to that opinion. The opinion by the three-judge panel in *Miller* was subsequently reversed by a divided court sitting en banc in an opinion handed down April 8, 1968. We cite the panel's slip opinion merely because it incorporates the Government's references to the legislative history of the Act, a part of which we have heretofore referred to. The facts in the *Miller* case are patently distinguishable from those in the instant case. As examples, in *Miller* the amusement park was "located on a major artery of both intrastate and interstate transportation; * * * its advertisements solicit the business of the public generally" and were not confined to club members; and "ten of its eleven mechanical rides admittedly were purchased from sources outside Louisiana."

What clearly distinguishes the case before us from other cases filed under this statute is the total lack of any evidence that the operations of Lake Nixon in any fashion affect commerce. There is no evidence that any interstate traveler ever patronized this facility, or that it offered to serve interstate travelers, or that any portion of the food sold there moved in commerce, or that there were any exhibitions or other sources of entertainment which moved in or affected commerce.

The Congress by specifically and in plain language defining the criteria for coverage under subsection (c) precludes the court from holding upon any rule of construction that interstate commerce was affected absent requisite evidence establishing the criteria spelled out in the statute. There is no such evidence in this record.

We have read all the cases cited by the parties, as well as others, and our research has failed to disclose a single case where there was a complete absence of evidence, as there is in the instant case, to establish coverage under the Act.

The judgment of the district court is affirmed.

HEANEY, Circuit Judge (dissenting):

In my view, the judgment of the District Court cannot be upheld. It is based on an erroneous theory of the law and is not supported by the facts found by the court.

The court held that the Lake Nixon Club is not a covered establishment under the Civil Rights Act of 1964, § 201 (b) (2) and (4), 42 U.S.C. § 2000a(b) (2) and (4) (1964), despite the fact that a lunch counter is operated on the premises, because the lunch counter is merely an adjunct to the business of making recreational facilities available to the public, and is not a separate establishment.

This conclusion is not supportable. Whether the lunch counter is an adjunct of or necessary to the operation of the Club is immaterial, as is the question of whether the lunch counter is operated as a separate establishment or as a part of a coordinated whole.

Mr. Chief Justice Warren, commenting on the effect of a food facility in an amusement park in Drews v. Maryland, 381 U.S. 421, 428, n. 10, 85 S.Ct. 1576, 1580, 14 L.Ed.2d 693 (1965),[1] stated:

"There is a restaurant at Gwynn Oak Park; indeed, petitioners were standing next to it when they were arrested. If a substantial portion of the food served in that restaurant has moved in interstate commerce,[2] the

---

1. For reasons hereinafter stated, it is my opinion that, in this' case, commerce requirements were met by a showing that the Club served and offered to serve travelers in interstate commerce, thus I

do not reach the issue of whether a substantial portion of the food moved in interstate commerce.

[2]. The defendant and others refused to leave an amusement park and were con-

entire amusement park is a place of public accommodation under the Act. * * * "

In Evans v. Laurel Links, Inc., 261 F. Supp. 474 (E.D.Va.1966), the court found that a golf course was a public accommodation within the meaning of the Act because it had a lunch counter located on it. It did this even though the lunch counter accounted for only fifteen per cent of the gross receipts of the golf course. (Lunch counter receipts at Lake Nixon Club were approximately 22.8% of its gross income.)[3] In *Evans*, the court said:

"The location of the lunch counter on the premises brings the entire golf course within the Act under 42 U.S.C. § 2000a(b) (4) (A) (ii) which provides that any establishment within the premises of which is located a covered establishment is a place of public accommodation. See H.R. Rep. No. 914, 88th Cong., 2d Sess. (1964) (additional Majority Views, Hon. Robert W. Kastenmeier) U.S.Code Cong. & Admin. News, pp. 2409, 2410 (1964); Rasor, Regulation of Public Accommodations Via the Commerce Clause—The Civil Rights Act of 1964, 19 Sw.L.J. 329, 331 (1965)."

Id. at 476.

In Adams v. Fazzio Real Estate Co., Inc., 268 F.Supp. 630 (E.D.La.1967), the court held that the snack bar located on the premises of the bowling alley brought the entire facility under the Act. It stated:

"The statute contains no percentage test, and it is not necessary to show that the covered establishment which magnetizes the non-covered establishment in which it is physically located occupies a majority, or even a substantial part of the premises, or that its sales are major or even a substantial part of the revenues of the establishment. * * * "

Id. at 638 (footnote omitted).

In Scott v. Young, 12 Race Rel.L.Rep. 428 (E.D.Va.1966), the parties consented to the entry of an order providing that as long as an eating establishment was operated on the premises of a recreational facility, the entire facility would be considered a public accommodation within the meaning of the 1964 Civil Rights Act, and that the defendant would be enjoined from denying the equal use of the facility to any person on the basis of race or color.

Furthermore, House Report 914 stated that the establishments covered under § 201(b) (4) "would include, for example, retail stores which contain public lunch counters otherwise covered by title II;"[4] and the additional views of the minority stated that "Section 201(d) precludes racial discrimination * * *. * * * [of] department stores (operating a lunch counter) * * *."[5]

victed in a Maryland State Court of disorderly conduct and disturbance of the peace. After having previously remanded the case to the State Court of Appeals, the Supreme Court dismissed a subsequent appeal and refused to grant certiorari. Mr. Chief Justice Warren, joined by Mr. Justice Douglas, dissented and would have granted certiorari. In the course of discussing the legal issues involved, the Chief Justice noted that although the 1964 Civil Rights Act was passed after the occurrence of the conduct for which the defendants were prosecuted, the Act abated the pending convictions. Hamm v. City of Rock Hill, 379

U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964). In the course of stating that view, he made the observations quoted above.

3. In 1966, the gross income from food sales was $10,468.95, as compared with a total gross income of $46,326.

4. House Report (Judiciary Committee) No. 914, 1964 U.S.Code Cong. & Ad.News, pp. 2391, 2396.

5. Additional Views on H.R. 7152 of Hon. William M. McCulloch, Hon. John V. Lindsay, Hon. William T. Cahill, Hon. Garner E. Shriver, Hon. Clark Mac-

In *Drews,*[6] *Evans, Adams* and *Scott,* the records indicate that the lunch counter and the recreation facility were owned by the same entity and operated as one coordinated facility.

The District Court relies on Pinkney v. Meloy, 241 F.Supp. 943 (N.D.Fla.1965), to support its holding that a lunch counter must be a separate establishment (apparently separately owned) to evoke § 201 (b) (4). There, the court held that a barber shop could not discriminate as it was located within a hotel, which was a covered establishment. The barber shop was separately owned, but that fact was not critical to the *Pinkney* decision. The legislative history of the Act gives as an example the precise fact situation involved in *Pinkney:*

"A hotel barbershop or beauty parlor would be an integral part of the hotel, *even though* operated by some independent person or entity [Emphasis added]." [7]

The majority opinion of this Court does not base its decision on the rationale of the District Court that Lake Nixon is not a covered establishment within the meaning of §§ 201(b) (2) and (4). It relies instead on an alternative ground, namely, that even if it is otherwise covered, "There is a total lack of proof that Lake Nixon Club served or offered to serve interstate travelers or that a substantial portion of the food served moved in interstate commerce." One of these elements must, of necessity, be established to bring the Club within the Act.[8]

As I read the District Court's decision, it avoided making a specific finding on

---

Gregor, Hon. Charles McC. Mathias, Hon. James E. Bromwell, 1964 U.S.Code Cong. & Ad.News, 2487, 2494.

6. Drews v. State, 224 Md. 186, 167 A.2d 341, 342 (1961).

7. Senate Report (Judiciary Committee) No. 872, 1964 U.S.Code Cong. & Ad.News, pp. 2355, 2358–2359.

8. It need not be established that the defendants' food "operations affect commerce" if the discriminatory practices by the defendants were "supported by state action." A state action theory of the case was not alleged nor argued.
   The 1964 Civil Rights Act specifically defines "supported by state action:"
   "§ 201(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof."
   An Arkansas statute purports to give an omnibus right to descriminate:
   "§ 71–1801. *Right to select customers, patrons or clients.*—Every person, firm or corporation engaged in any public business, trade or profession of any kind whatsoever in the State of Arkansas, including, but not restricted to, * * * restaurants, dining room or lunch counters, * * *, or other places of entertainment and amusement, including public parks and swimming pools, * * *, is hereby authorized and empowered to choose or select the person or persons he or it desire to do business with, and is further authorized and empowered to refuse to sell to, wait upon or serve any person that the owner, manager or employee of such public place of business does not desire to sell to, wait upon or serve; * * *."
   Arkansas Statutes Annotated, Vol. 6A (1967 Supp.).
   The statute is further supported by criminal sanctions:
   "§ 71–1803. *Failure to leave after request—Penalty.*—Any person who enters a public place of business in this State, or upon the premises thereof, and is requested or ordered to leave therefrom by the owner, manager, or any employee thereof, and, after having been so requested or ordered to leave, refuses so to do, shall be guilty of a trespass and upon conviction therefor shall be fined not more than five hundred dollars ($500.00) or imprisoned in jail not more than six (6) months, or both such fine and imprisonment. [Acts 1959, No. 169, § 3, p. 1007.]"
   Arkansas Statutes Annotated, Vol. 6A (1967 Supp.).

whether the Club offered to serve interstate travelers. It did, however, state:

"It is probably true that some out-of-state people spending time in or around Little Rock have utilized [Lake Nixon Club facilities]."

This statement, in my view, constitutes a clear and specific finding that the Club served interstate travelers and was sufficient in and of itself to satisfy the interstate commerce requirement of the Act set forth in § 201(c) (2).[9] Since this requirement is satisfied, the Club is covered.

While it is not necessary to find additional grounds to satisfy the commerce requirements of the Act, the record also supports the conclusion that the Club offered to serve travelers in interstate commerce: (1) the Club advertised on KALO radio on Wednesdays, Thursdays and Fridays from the last of May through the 7th of September;[10] (2) it inserted one advertisement in "Little Rock Today," a monthly magazine, indicating available attractions in the Little Rock area in the same period; (3) it inserted one advertisement in the "Little Rock Air Force Base," a monthly newspaper published at the Little Rock Air Force Base, at Jacksonville, Arkansas.

It is clear, as pointed out in the majority opinion, that the advertisements were directed to "members." It is thus argued that interstate travelers would not consider the invitation as having been addressed to them. I cannot agree. The membership idea was clearly a ruse to keep Negroes from using the Club. It was obviously understood to be such by the people living in the Little Rock area, and there is little reason to doubt that nonresidents would be less sophisticated. It also appears, from the choice of media, that the message was intended to reach nonresidents as well as local citizens. No other sound reason can be advanced for using mass media to promote "entertainment" at a "private" club.

The District Court rationalized that the Club was not a place of exhibition or entertainment as § 201(b) (3) was not intended to cover facilities where

---

In view of the fact that I would reverse on other grounds, it is not necessary to express a view as to whether the plaintiff has made a prima facie case that the discrimination is supported by state action under § 201(b) (1) by simply showing that the defendant discriminated and that the statute explicitly gave him that right. Cf., Adickes v. S. H. Kress & Company, 252 F.Supp. 140 (S.D.N.Y.1966). Furthermore, it is not necessary to express an opinion as to whether it is a defense to establish that the defendant would have discriminated regardless of the state statute. Williams v. Hot Shoppes, Inc., 110 U.S.App.D.C. 358, 293 F.2d 835, 846–847 (1961) (dissenting opinion), cert. denied, 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505 (1962).

9. The conclusion of the District Court draws additional support from the following facts:
   (1) The defendants made no attempts to specifically exclude interstate travelers:
      (a) The membership card did not require that the applicant sign his address;
      (b) The advertisements did not suggest that an interstate traveler could not become a member; and
      (c) There is no sign posted at the entrance which restricted the membership only to Arkansas residents.
   (2) Members brought guests.
   (3) Lake Nixon appears to be only about six to eight miles by road from the only federal highway between Little Rock and Hot Springs.

10. The radio copy read as follows:
   "Attention · . . all members of Lake Nixon. Attention all members of Lake Nixon. In answer to your requests, Mr. Paul is happy to announce the Saturday night dances will be continued . . . this Saturday night with music by the Villagers, a great band you all know and have asked to hear again. Lake Nixon continues their policy of offering you year-round entertainment. The Villagers play for the big dance Saturday night and, of course, there's the jam session Sunday afternoon . . . also swimming, boating, and miniature golf. That's Lake Nixon. . . . . ."

people came to enjoy themselves by swimming, golfing, boating or picnicking. It reasoned that the Act was only intended to apply to a situation "where patrons came to be edified, entertained, thrilled or amused in their capacity of spectators or listeners." While it is unnecessary to reach this issue here, the majority opinion reaches it, and thus I feel obliged to.

I cannot concur with the majority: (1) It is difficult to conclude that the Club was not a place of entertainment when the defendants characterized it in those terms in their radio advertisements: "Lake Nixon continues their policy of offering you year-round entertainment." Footnote 10, supra. See also, Miller v. Amusement Enterprises, Inc., 391 F.2d 86, Civ. No. 24259 (5th Cir. April 8, 1968) (en banc) reversing 259 F.Supp. 523 (E.D.La.1966). (2) It is equally difficult to conclude that the operation of the Club did not affect commerce within the meaning of § 201(c) (3), for the District Court specifically found that the juke boxes, which furnished music for dancing or listening, were manufactured outside of Arkansas, that some of the records played on them were manufactured outside of Arkansas, and that part of the other recreational equipment and apparatus (aluminum paddle boats and "Yaks"—surfboards) were brought into Arkansas from without the state. The fact that the aluminum paddle boats and the "Yaks" (surfboards) could have been manufactured in Arkansas is, in my judgment, not material when the District Court found and the record shows that they were leased and purchased [11] from an Oklahoma concern and imported into Arkansas.

11. It appears from the record that the "Yaks" were purchased rather than leased:

"Q. Do you have any other kind of boats there?
"A. We have what we call a yak.
"Q. A yak; what's a yak?
"A. Its similar to a surfboard.
"Q. Similar to a surfboard; do you know where you purchased that?

"A. From the same company.
"Q. What company is that?
"A. Aqua Boat Company.
"Q. Who?
"A. Aqua Boat Company.
"Q. Is that a local Company?
"A. No.
"Q. Where is it?
"A. I believe they're in Oklahoma, Bartlesville."