UNITED STATES of America, by Ramsey CLARK, Attorney General, Plaintiff,

v.

Glenn Walter FRALEY, d/b/a Fraley's Tavern, Defendant.

No. C-56-S-67.

United States District Court
M. D. North Carolina,
Salisbury Division.

April 9, 1968.

Ramsey Clark, Atty. Gen., John Doar, Asst. Atty. Gen., and Maceo W. Hubbard, Atty., Dept. of Justice, Washington, D. C., and William H. Murdock, U. S. Atty., Greensboro, N. C., for plaintiff.

Richard Lane Brown, III, of Brown, Brown & Brown, Albemarle, N. C., for defendant.

## FINDINGS OF FACT AND CON-CLUSIONS OF LAW

EDWIN M. STANLEY, Chief Judge.

The plaintiff, United States of America, by Ramsey Clark, Attorney General, seeks by this action to restrain the defendant, Glenn Walter Fraley, the owner and operator of an establishment in Rowan County, North Carolina, known as Fraley's Tavern, from operating his establishment on a racially segregated basis in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. The defendant denies that he is operating a place of public accommodation within the meaning of the Act for the reason that he does not operate an establishment *principally* engaged in selling food for consumption on the premises.

The matter has been submitted to the Court for consideration and decision on the basis of a stipulated record. Accordingly, after considering the pleadings, affidavits, depositions, exhibits, and other stipulated documents, the Court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

### FINDINGS OF FACT

1.  This action is brought under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. Jurisdiction of the Court and the right of the Attorney General to bring the action are not questioned.

2.  The defendant, Glenn Walter Fraley, operates an establishment known as Fraley's Tavern. The establishment is located north of Albemarle, Rowan County, North Carolina, near the intersection of state highway No. 49 and Stokes Ferry Road, a secondary road, within the jurisdiction of this Court. The building in which the tavern is located was designed and built by the defendant in 1964, at a cost of about $30,000.00.

3.  The defendant has pursued a policy and practice of racial discrimination in the operation of Fraley's Tavern, and has refused, and continues to refuse, to provide services to Negroes on the same basis as services are provided to white members of the general public.

4.  The building contains two public rooms, rest-rooms, a beer storage area, and a kitchen. The entire building contains 3,368 square feet.

5.  The dining room is separated into a dining area and a dance floor by a waist-high partition. The dining area

contains 1,050 square feet of floor space, and provides seating accommodations for 80 persons. The dance floor contains 700 square feet of space.

6. The barroom, 700 square feet in size, contains booths with seating capacity for 20 persons, and stools for 12 other persons at the bar.

7. The kitchen, containing about 168 square feet of space, is completely enclosed, and is separate from the dining room and the barroom. It is equipped with a pizza oven, a baster oven, a deep fryer, a grill, a chicken "broaster," storage facilities for frozen and refrigerated foods, a large double sink for dishwashing, and storage space for the table service and flatware.

8. A beer storage room and walk-in cooler are located behind the bar and adjacent to the kitchen. The average inventory of beer in the storage room and cooler is approximately 500 cases.

9. A men's rest-room adjoins the bar, and men's and women's rest-rooms adjoin the dining room.

10. Defendant's business hours are from 7:30 a. m. until midnight, Monday through Saturday. The dining room is open from 5 o'clock in the afternoon until midnight, Monday through Saturday.

11. Fraley's Tavern sells beer for carry-out, or off-premises, consumption, and serves beer for consumption on the premises. Defendant is duly licensed for such sales. There is no distinction between the sale of beer for consumption on and off the premises, and such beer sales are made from the same business, the same inventory, and pursuant to the same license.

12. Sandwiches and pizza are served in the barroom each day from the lunch hour until closing. After 5 o'clock in the afternoon, full-course meals, as well as sandwiches and pizza, are served in both the dining room and the barroom. The menu offers fourteen entrees, including chicken, steaks and a variety of seafoods. These entrees are served with tossed salads, vegetables and hot rolls, or hush puppies. In addition, the menu offers a sandwich selection and two sizes of pizza with a choice of condiments which include pepperoni, anchovies and mushrooms.

13. The luncheon trade at the defendant's establishment is erratic. Occasionally, although not frequently, no food is served during lunch hours. On a busy day, the defendant may serve as many as 20 sandwiches or 5 or 6 pizzas. On a typical day, more pizzas are served after 5 o'clock than during the lunch hour.

14. On Friday and Saturday evenings, music is provided in the dining room by a band of local musicians; dining room service is restricted to couples; and a "cover charge" of 50¢ per person is charged. These evenings are also the establishment's busiest. On Saturday evenings, the dining room is normally filled to capacity, and many of the patrons do not order food. Instead, they come to sit, drink beer and dance, and it is estimated that on Saturday evenings 25% of dining room sales consists of beer.

15. The defendant's food preparation methods and facilities are regularly inspected for sources of food contamination, and graded by officials of the North Carolina State Board of Health. The defendant regularly receives the highest sanitary rating awarded, and, as required by law, keeps a copy of the inspection report on display.

16. The defendant is licensed by the North Carolina Department of Revenue to engage in the business of operating "a restaurant, cafe, cafeteria * * * or other place where prepared food sold * * *." The defendant paid $106.00 for the license he now holds.

17. Fraley's Tavern is operated, managed and supervised by the defendant and his wife. They employ two full-time regular employees, and one part-time employee. The defendant personally opens and closes the tavern each day. Until midafternoon, he tends the bar, handles all carry-out beer sales, and cooks and serves sandwiches and pizzas. After the dining room opens at 5 o'clock each after-

noon, the defendant also waits on tables in the dining room. Most of his dining room work, however, is confined to Friday and Saturday nights.

18. A bartender reports for work at 3:30 o'clock in the afternoon each weekday, and at 1 o'clock each Saturday. He works in the barroom until closing each night, and is paid a salary of $100.00 per week.

19. The cook reports for work at 5 o'clock each afternoon, when the dining room opens. She works only in the kitchen and dining room, preparing and serving meals and serving beer. She works until closing each night, and is paid a salary of $62.50 per week, exclusive of tips.

20. The defendant's wife, a co-owner of the tavern, works four days per week. On Thursday, Friday and Saturday evenings, she works from 5 o'clock until closing, waiting on tables in the dining room. During the day each Friday, she goes to Albemarle to select and purchase perishable foodstuffs, steaks and vegetables. These are purchased at retail so that she may personally insure the quality of the food served at the tavern. Each Monday, Mrs. Fraley works a full day cleaning the kitchen and equipment, and taking inventory of the food on hand.

21. On Friday and Saturday nights, the defendant, his wife, and the cook work full-time in the dining room and kitchen. On both nights, a part-time bartender assists the regular bartender in the barroom.

22. The principal factual dispute between the parties relates to the percentage of defendant's business attributable to the sale of beer and the percentage attributable to the sale of food. Evidence on the point is found in affidavits and depositions, and is lacking in clarity and precision in a number of respects. The affidavit of John M. Quigley, Special Agent of the Federal Bureau of Investigation, states that when the defendant was interviewed on December 6, 1966, at his place of business, he advised that for the year ending December 31, 1965, he estimated that approximately 22% of his business was from the sale of food, approximately 75% from the sale of beer, and approximately 3% from the sale of miscellaneous items. On October 3, 1967, the defendant filed an affidavit stating that at the time he was interviewed by Special Agent Quigley he did not have his books available and that the figures given on the sale of food, beer and miscellaneous items were only estimates and were not reasonably accurate. The defendant also stated that, based on analysis prepared by his accountant, the amount of food sold on the tavern premises represented less than 6% of his total sales. On May 10, 1967, H. E. Fenters, the defendant's accountant, filed an affidavit stating that he had been keeping the books and financial records and preparing income tax returns for Fraley's Tavern since 1962, and was completely familiar with the entire business operation of the tavern. Based upon the financial records, income tax returns and audits of the business, Mr. Fenters was of the opinion that for the years 1964, 1965 and 1966, the defendant's beer sales represented 94.-807% of his gross receipts and that food sales represented only 5.193% of his gross receipts. The parties stipulated that the defendant's records of cash expenditures for the year ending December, 31, 1966, show that defendant purchased for resale in his business beer and nonfood merchandise in the amount of $101,789.92, and purchased foodstuffs for resale in the amount of $6,079.72. When his deposition was taken, the defendant testified that his recorded beer receipts on weekdays included some money from the sale of food, and that his recorded food sales also included some money received from the sale of beer. As a consequence, the defendant testified that it was impossible to tell precisely how much beer or food was sold on a given day at his tavern. On deposition, Mr. Fenters, defendant's accountant, stated that he was aware of the fact that some of the figures the defendant had given him from time to time

included food sales in the beer receipts and beer sales in the food receipts, and that his figures relating to food sales did not include sales of food Mondays through Thursdays, or prior to 5 o'clock on Fridays and Saturdays.

23. While the foregoing evidence relating to the percentage of sales attributable to food items and the percentage attributable to the sale of beer is somewhat conflicting and rather indefinite, resulting mainly from failure of the defendant to keep accurate records of food and beer sales, the Court is of the opinion, and so finds, that of the defendant's gross receipts, approximately 10% is derived from the sale of food.

24. It is not disputed, and the Court finds, that a substantial portion of the food and other products sold by the defendant has moved in commerce.

## DISCUSSION

The sole issue for determination is whether the defendant's establishment is a place of public accommodation within the meaning of 42 U.S.C. § 2000a. Jurisdiction and the right of the Attorney General to bring the action are not questioned. It is also conceded that a substantial portion of the food and other products sold by the defendant has moved in interstate commerce.

The pertinent provisions of 42 U.S.C. § 2000a(b) are as follows:

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

\* \* \* \* \* \*

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; \* \* \*

\* \* \* \* \* \*

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."

It is manifest that the establishment operated by the defendant has all the identifying characteristics of a "restaurant." A wide variety of sandwiches, snacks and full-course meals are served. At any time between lunch and midnight, any white member of the general public can enter the tavern, be seated in a booth or at a counter, and be served a sandwich or pizza. Additionally, after 5 o'clock in the afternoon, any white member of the general public can also be seated at a table in the dining room and be served a full-course meal. His meal may include a salad, any of fourteen entrees, vegetables and hot bread. Soft drinks, coffee, tea, milk or beer are available as a beverage. The restaurant is licensed, inspected, and graded by officials of the State of North Carolina. The dining room, comprising almost one-third of the entire building, provides seating accommodations for 80 persons. Food is also served in the barroom, which has seating accommodations for 32 persons. The establishment has a sizable and well-equipped kitchen used for the preparation of food, and a cook is employed to prepare the food. There can be no question that the sizable dining room and kitchen areas of the defendant's establishment are principally, if not wholly, engaged in the preparation and sale of food for consumption on the premises. Moreover, the tavern holds itself out to the public as an eating establishment, and it has all the characteristics of a restaurant.

The defendant's principal argument is that since only a minor and insignificant part of his total revenue is derived from the operation of his restaurant, his establishment is not "principally engaged

in selling food for consumption on the premises," and thus is not a place of public accommodation. This argument finds no support in either the language of the Act or the decided cases.

In Adams v. Fazzio Real Estate Co., 268 F.Supp. 630 (E.D.La., 1967), the defendant operated a bowling alley and refreshment counter in a building containing 29,900 square feet. The refreshment area was approximately 37 feet long and 13 feet wide, and had stools for seating 15 people. The principal items sold were beer, soft drinks, hamburgers, hot dogs, and other similar items. It was estimated that more than one-half of the sales from the refreshment counter was from the sale of beer. The defendant argued that since the refreshment area occupied only 2% of the entire space of the building, provided only 8% of the gross revenue, and was only incidental to the operation of the bowling alley, it was not covered by the Act. In rejecting this argument, the Court stated:

"Fazzio's itself doesn't call the facility a 'bar' or a 'tavern'; it refers to the facility as a 'snack bar.' In physical appearance, it looks like a lunch counter. Service is at a counter provided with stools. The counter is of the kind generally used in facilities called 'lunch counters' rather than the kind customarily used in bars. The posted menu lists a variety of sandwiches and beverages; beer is only one of many items listed. The public would see nothing amiss in a sign calling it a lunch counter. The judge who said it could not be so characterized would be shutting his eyes to the normal meaning of the words used in the Act.

"The statutory language leads clearly to this result. Congressional committee reports confirm it. What is said in Congressional committee reports and in debates should not change the meaning of clear statutory language. But these do afford insight into Congressional intent. They demonstrate whether the statutory language was inadvertent or clearly directed to the intended purpose.

"Honorable Robert W. Kastenmeier who joined in the majority report of the House Judiciary Committee on H.R. 7152, which became the Civil Rights Act of 1964, filed a separate report in which he said that in his opinion the bill was of dubious morality because it covered bowling alleys that serve sandwiches and permitted bowling alleys that did not serve sandwiches to remain segregated. That is the necessary consequence of the statutory structure.

"However, even if we conclude that the facility is not a lunch counter and isolate for decision the question whether it is a facility engaged principally in the sale of food for consumption on the premises, we would again reach the conclusion that this is a covered establishment. Lord Tenterden's Rule, or the rule of ejusdem generis, assists us in interpreting this phrase, for it tells us that the term implies a facility like a restaurant or lunch counter. The comparable section in Senate Bill 1732 extended to 'any other public place engaged in selling food for consumption on the premises.' The House Bill, H.R. 7152, the text of which became the Civil Rights Act of 1964 used the language 'any other facility principally engaged in selling food for consumption on the premises.' The reports do not give the reasons for the changes, but the word 'facility' is obviously intended to be broader than the words 'public place.' The adverb 'principally' as a modifier to the verb, 'engaged,' does not appear designed to limit its scope. The word 'principally' implies that the sale of food must be the 'main' or 'chief activity' [Webster's Third International Dictionary] and the sale of food clearly is the main or chief activity of the refreshment counter."

Similarly, in Evans v. Laurel Links, Inc., 261 F.Supp. 474 (E.D.Va., 1966),

the Court held that a lunch counter in a golf course clubhouse was a covered establishment even though the menu offered only beer and "soft drinks, coffee, milk, sandwiches, cakes, candy, peanuts, ice cream, and several other miscellaneous items," and the gross revenue taken in by the lunch counter was only 15% of the gross receipts of the golf club.

In Cuevas v. Sdrales, 10 Cir., 344 F.2d 1019 (1965), cert. den. 382 U.S. 1014, 86 S.Ct. 625, 15 L.Ed.2d 528 (1966), the Court held that a tavern primarily engaged in selling beer, a drink rather than food, and which did not serve meals or other food to be eaten as is customary in restaurants, cafeterias, lunch rooms, lunch counters, and soda fountains, was not a place of public accommodation within the meaning of the Act. In contrast, the defendant here serves much of his beer with meals and sandwiches or to patrons who come to his establishment in order to eat. Moreover, the kitchen and dining room, occupying a substantial portion of his premises, are devoted to food service, and the barroom is regularly used as a dining area. The kitchen and dining room equipment represents a substantial capital investment. A cook is employed to prepare food to be served on the premises, and the bartender even serves food on occasions. The conclusion is inescapable that the defendant's restaurant is a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b) (2). The recent case of United States of America by Ramsey Clark, Attorney General, v. All Star Triangle Bowl, Inc., et als., No. 68–111, District of South Carolina, decided February 22, 1968, 283 F.Supp. 300, fully supports this conclusion.

The Court, in Newman v. Piggie Park Enterprises, Inc., 4 Cir., 377 F.2d 433 (1967), modified on other grounds 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) while concerned with an entirely different question, refused. to adopt a construction that would impose arbitrary limits on the application and scope of the Act.

And finally, since it is not disputed that the defendant's non-covered bar is physically located within the same premises as his restaurant, and that the bar holds itself out as serving patrons of the restaurant, the entire establishment is a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b) (4). Evans v. Laurel Links, Inc., 261 F.Supp. 474 (E.D.Va., 1966), and Adams v. Fazzio Real Estate Co., 268 F.Supp. 630 (E.D.La., 1967).

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. Fraley's Tavern, the establishment operated by the defendant, is a restaurant principally engaged in selling food for consumption on the premises, and is thus a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b) (2). The bar operated by the defendant within the same premises as his restaurant, and which holds itself out as serving patrons of the restaurant, is likewise a place of public accommodation within the meaning of 42 U.S.C § 2000a(b) (4).

3. The acts and practices of the defendant deprive Negro citizens of the full and equal use and enjoyment of a place of public accommodation as guaranteed by Title II of the Civil Rights Act of 1964.

4. The plaintiff is entitled to a permanent injunction as a matter of law.

A judgment will be entered accordingly.