DANIEL ET AL. *v.* PAUL.

No. 488.   Argued March 24–25, 1969.—Decided June 2, 1969.

*Conrad K. Harper* argued the cause for petitioners *pro hac vice.* With him on the brief were *Jack Greenberg, James M. Nabrit III,* and *Norman C. Amaker.*

*James W. Gallman,* by invitation of the Court, 393 U. S. 1061, argued the cause and filed a brief as *amicus curiae* in support of the judgment below.

*Assistant Attorney General Leonard* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Griswold* and *Louis F. Claiborne.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioners, Negro residents of Little Rock, Arkansas, brought this class action in the District Court for the Eastern District of Arkansas to enjoin respondent from denying them admission to a recreational facility called Lake Nixon Club owned and operated by respondent, Euell Paul, and his wife. The complaint alleged that Lake Nixon Club was a "public accommodation" subject to the provisions of Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a *et seq.,* and that respondent violated the Act in refusing petitioners admission solely on racial grounds.[1] After trial, the District Court, although finding that respondent had refused petitioners admission solely because they were Negroes,[2]

---

[1] Petitioners alleged that the denial of admission also constitutes a violation of the Civil Rights Act of 1866, as amended, 14 Stat. 27, now 42 U. S. C. § 1981. Neither the District Court nor the Court of Appeals passed on this contention. Our conclusion makes it unnecessary to consider the question.

[2] Respondent at trial answered affirmatively a question of the trial judge whether Negroes were denied admission "simply . . . because they were Negroes." Respondent's answer to an interrogatory why Negroes were refused admission was: "[w]e refused admission to them because white people in our community would not patronize us if we admitted Negroes to the swimming pool. Our business would be ruined and we have our entire life savings in it."

dismissed the complaint on the ground that Lake Nixon Club was not within any of the categories of "public accommodations" covered by the 1964 Act. 263 F. Supp. 412 (1967). The Court of Appeals for the Eighth Circuit affirmed, one judge dissenting. 395 F. 2d 118 (1968). We granted certiorari. 393 U. S. 975 (1968). We reverse.

Lake Nixon Club, located 12 miles west of Little Rock, is a 232-acre amusement area with swimming, boating, sun bathing, picnicking, miniature golf, dancing facilities, and a snack bar. The Pauls purchased the Lake Nixon site in 1962 and subsequently operated this amusement business there in a racially segregated manner.

Title II of the Civil Rights Act of 1964 enacted a sweeping prohibition of discrimination or segregation on the ground of race, color, religion, or national origin at places of public accommodation whose operations affect commerce.[3] This prohibition does not extend to discrimination or segregation at private clubs.[4] But, as both courts below properly found, Lake Nixon is not a private club. It is simply a business operated for a profit with none of the attributes of self-government and member-ownership traditionally associated with private clubs. It is true that following enactment of the Civil Rights Act of 1964, the Pauls began to refer to the establishment as a private club. They even began to require

---

[3] Section 201 (a) of the Act provides:

"All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

[4] Section 201 (e) of the Act provides:

"The provisions of this title shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b)."

patrons to pay a 25-cent "membership" fee, which gains a purchaser a "membership" card entitling him to enter the Club's premises for an entire season and, on payment of specified additional fees, to use the swimming, boating, and miniature golf facilities. But this "membership" device seems no more than a subterfuge designed to avoid coverage of the 1964 Act. White persons are routinely provided "membership" cards, and some 100,000 whites visit the establishment each season. As the District Court found, Lake Nixon is "open in general to all of the public who are members of the white race." 263 F. Supp., at 418. Negroes, on the other hand, are uniformly denied "membership" cards, and thus admission, because of the Pauls' fear that integration would "ruin" the "business." The conclusion of the courts below that Lake Nixon is not a private club is plainly correct—indeed, respondent does not challenge that conclusion here.

We therefore turn to the question whether Lake Nixon Club is "a place of public accommodation" as defined by § 201 (b) of the 1964 Act, and, if so, whether its operations "affect commerce" within the meaning of § 201 (c) of that Act.

Section 201 (b) defines four categories of establishments as covered public accommodations. Three of these categories are relevant here:

> "Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce . . . .
>
> . . . . .
>
> "(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such

facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A) . . . (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment."

Section 201 (c) sets forth standards for determining whether the operations of an establishment in any of these categories affect commerce within the meaning of Title II:

"The operations of an establishment affect commerce within the meaning of this title if . . . (2) in the case of an establishment described in paragraph (2) [set out *supra*] . . . , it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) [set out *supra*] . . . , it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) [set out *supra*] . . . , there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States . . . ."

Petitioners argue first that Lake Nixon's snack bar is a covered public accommodation under §§ 201 (b)(2) and 201 (c)(2), and that as such it brings the entire establish-

ment within the coverage of Title II under §§ 201 (b)(4) and 201 (c)(4). Clearly, the snack bar is "principally engaged in selling food for consumption on the premises." Thus, it is a covered public accommodation if "it serves or offers to serve interstate travelers or a substantial portion of the food which it serves . . . has moved in commerce." We find that the snack bar is a covered public accommodation under either of these standards.

The Pauls advertise the Lake Nixon Club in a monthly magazine called "Little Rock Today," which is distributed to guests at Little Rock hotels, motels, and restaurants, to acquaint them with available tourist attractions in the area. Regular advertisements for Lake Nixon were also broadcast over two area radio stations. In addition, Lake Nixon has advertised in the "Little Rock Air Force Base," a monthly newspaper published at the Little Rock Air Force Base, in Jacksonville, Arkansas. This choice of advertising media leaves no doubt that the Pauls were seeking broad-based patronage from an audience which they knew to include interstate travelers. Thus, the Lake Nixon Club unquestionably offered to serve out-of-state visitors to the Little Rock area. And it would be unrealistic to assume that none of the 100,000 patrons actually served by the Club each season was an interstate traveler.[5] Since the Lake Nixon Club offered to serve and served out-of-state persons, and since the Club's snack bar was established to serve all patrons of the entire facility, we must conclude that the snack bar offered to serve and served out-of-state persons. See *Hamm* v. *Rock Hill,* 379 U. S. 306, 309 (1964); see also *Wooten* v. *Moore,* 400 F. 2d 239 (C. A. 4th Cir. 1968).

---

[5] The District Court, which did not find it necessary to decide whether the snack bar served or offered to serve interstate travelers, conceded that: "It is probably true that some out-of-State people spending time in or around Little Rock have utilized [Lake Nixon's] facilities." 263 F. Supp., at 418.

The record, although not as complete on this point as might be desired, also demonstrates that a "substantial portion of the food" served by the Lake Nixon Club snack bar has moved in interstate commerce. The snack bar serves a limited fare—hot dogs and hamburgers on buns, soft drinks, and milk. The District Court took judicial notice of the fact that the "principal ingredients going into the bread were produced and processed in other States" and that "certain ingredients [of the soft drinks] were probably obtained . . . from out-of-State sources." 263 F. Supp., at 418. Thus, at the very least, three of the four food items sold at the snack bar contain ingredients originating outside of the State. There can be no serious doubt that a "substantial portion of the food" served at the snack bar has moved in interstate commerce. See *Katzenbach* v. *McClung,* 379 U. S. 294, 296–297 (1964); *Gregory* v. *Meyer,* 376 F. 2d 509, 511, n. 1 (C. A. 5th Cir. 1967).

The snack bar's status as a covered establishment automatically brings the entire Lake Nixon facility within the ambit of Title II. Civil Rights Act of 1964, §§ 201 (b)(4) and 201 (c)(4), set out *supra;* see H. R. Rep. No. 914, 88th Cong., 1st Sess., 20; *Fazzio Real Estate Co.* v. *Adams,* 396 F. 2d 146 (C. A. 5th Cir. 1968).[6]

Petitioners also argue that the Lake Nixon Club is a covered public accommodation under §§ 201 (b)(3) and 201 (c)(3) of the 1964 Act. These sections proscribe discrimination by "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment" which "customarily presents films, performances, athletic teams,

---

[6] Accord: *Evans* v. *Laurel Links, Inc.,* 261 F. Supp. 474 (D. C. E. D. Va. 1966); *United States* v. *Fraley,* 282 F. Supp. 948 (D. C. M. D. N. C. 1968); *United States* v. *All Star Triangle Bowl, Inc.,* 283 F. Supp. 300 (D. C. S. C. 1968).

exhibitions, or other sources of entertainment which move in commerce." Under any accepted definition of "entertainment," the Lake Nixon Club would surely qualify as a "place of entertainment."[7] And indeed it advertises itself as such.[8] Respondent argues, however, that in the context of § 201 (b)(3) "place of entertainment" refers only to establishments where patrons are entertained as spectators or listeners rather than those where entertainment takes the form of direct participation in some sport or activity. We find no support in the legislative history for respondent's reading of the statute. The few indications of legislative intent are to the contrary.

President Kennedy, in submitting to Congress the public accommodations provisions of the proposed Civil Rights Act, emphasized that "no action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a Negro citizen who seeks only equal treatment—than the barring of that citizen from restaurants, hotels, theatres, *recreational areas* and other public accommodations and facilities."[9] (Emphasis added.) While Title II was being considered by the Senate, a civil rights demonstration occurred at a Maryland amusement park. The then Assistant Majority Leader of the Senate, Hubert Humphrey, took note of the demonstration and opined that such an amusement

[7] Webster's Third New International Dictionary, at 757, defines "entertainment" as "the act of diverting, amusing, or causing someone's time to pass agreeably: [synonymous with] amusement."

[8] Respondent advertised over a local radio station that "Lake Nixon continues their policy of offering you year-round entertainment."

[9] Special Message to the Congress on Civil Rights and Job Opportunities, June 19, 1963, in Public Papers of the Presidents, John F. Kennedy, 1963, at 485. This statement was originally made in a Special Message to the Congress on Civil Rights, Feb. 28, 1963, in Public Papers, *supra,* at 228.

park would be covered by the provisions which were eventually enacted as Title II:

> "In this particular instance, I am confident that merchandise and facilities used in the park were transported across State lines.

> .　　　.　　　.　　　.　　　.

> "The spectacle of national church leaders being hauled off to jail in a paddy wagon demonstrates the absurdity of the present situation regarding equal access to public facilities in Maryland and the absurdity of the arguments of those who oppose title II of the President's omnibus civil rights bill." 109 Cong. Rec. 12276 (1963).

Senator Magnuson, floor manager of Title II, spoke in a similar vein.[10]

Admittedly, most of the discussion in Congress regarding the coverage of Title II focused on places of spectator entertainment rather than recreational areas. But it does not follow that the scope of § 201 (b)(3) should be restricted to the primary objects of Congress' concern when a natural reading of its language would call for broader coverage. In light of the overriding purpose of Title II "to remove the daily affront and humiliation involved in discriminatory denials of access to facilities

---

[10] "Motion picture theaters which refuse to admit Negroes will obviously draw patrons from a narrower segment of the market than if they were open to patrons of all races. . . . Thus, the demand for films from out of State, and the royalties from such films, will be less.

.　　　.　　　.　　　.　　　.

"These principles are applicable not merely to motion picture theaters but to *other establishments which receive supplies, equipment, or goods through the channels of interstate commerce.* If these establishments narrow their potential markets by artificially restricting their patrons to non-Negroes, the volume of sales and, therefore, the volume of interstate purchases will be less." (Emphasis added.) 110 Cong. Rec. 7402 (1964).

ostensibly open to the general public," H. R. Rep. No. 914, 88th Cong., 1st Sess., 18, we agree with the *en banc* decision of the Court of Appeals for the Fifth Circuit in *Miller* v. *Amusement Enterprises, Inc.*, 394 F. 2d 342 (1968), that the statutory language "place of entertainment" should be given full effect according to its generally accepted meaning and applied to recreational areas.

The remaining question is whether the operations of the Lake Nixon Club "affect commerce" within the meaning of § 201 (c)(3). We conclude that they do. Lake Nixon's customary "sources of entertainment . . . move in commerce." The Club leases 15 paddle boats on a royalty basis from an Oklahoma company. Another boat was purchased from the same company. The Club's juke box was manufactured outside Arkansas and plays records manufactured outside the State. The legislative history indicates that mechanical sources of entertainment such as these were considered by Congress to be "sources of entertainment" within the meaning of § 201 (c)(3).[11]

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I also rest on the Fourteenth Amendment. My views were set forth in *Bell* v. *Maryland*, 378 U. S. 226, 242, where I said:

"Segregation of Negroes in the restaurants and lunch counters of parts of America is a relic of slavery. It is a badge of second-class citizenship.

---

[11] The Senate rejected an amendment which would have ruled out most mechanical sources by requiring that the source of entertainment be one which has "not come to rest within a State." 110 Cong. Rec. 13915–13921 (1964). See also the remarks of Senator Magnuson, *supra*, n. 10.

It is a denial of a privilege and immunity of national citizenship and of the equal protection guaranteed by the Fourteenth Amendment against abridgment by the States." *Id.*, 260.

And see my concurring opinion in *Atlanta Motel* v. *United States*, 379 U. S. 241, 279 *et seq.*

MR. JUSTICE BLACK, dissenting.

I could and would agree with the Court's holding in this case had Congress in the 1964 Civil Rights Act based its power to bar racial discrimination at places of public accommodations upon § 5 of the Fourteenth Amendment.[1] But Congress in enacting this legislation did not choose to invoke this broad Fourteenth Amendment power to protect against racial discrimination; instead it tied the Act and limited its protection to congressional power to regulate commerce among the States. Both courts below found that respondent's swimming and recreational place is covered by the Act if its operations "affect commerce" within the meaning of § 201 (c) of the Act. The Act itself, in § 201 (c), provides the test for determining whether this respondent's recreational operations adversely affect interstate commerce. That test is to determine from evidence whether the operation of an establishment like respondent's (a) "serves or offers to serve interstate travelers" or (b) "a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce . . . ." In order, therefore, for the Act to be held to apply the test must be shown to be met by evidence and judicial

---

[1] "The Congress shall have power to enforce by appropriate legislation, the provisions of this article." U. S. Const., Amdt. XIV, § 5. See concurring opinion of Mr. Justice Clark, which I joined, in *United States* v. *Guest*, 383 U. S. 745, 761.

findings, not by guesswork, or assumptions, or "judicial knowledge" of crucially relevant facts, or by unproved probabilities or possibilities. My trouble with the Court's holding is that it runs roughshod over District Court findings supported by the record and emphatically affirmed by the Court of Appeals. Let us briefly review the facts and findings on the foregoing two separate conditions of the Act's applicability.

(A) Did Lake Nixon serve or offer to serve interstate travelers? There is not a word of evidence showing that such an interstate traveler was ever there or ever invited there or ever dreamed of going there. Nixon Lake can be reached only by country roads. The record fails to show whether these country roads are passable in all kinds of weather. They seem to be at least six to eight miles off the state or interstate roads over which interstate travelers are accustomed to travel. Petitioners did not offer evidence to show whether Lake Nixon is a natural lake, or whether it is simply a small body of water obtained by building a dam across a little creek in a narrow hollow between the hills. The District Court made findings about Lake Nixon and Spring Lake [2] as follows:

> "Both are accessible by country roads; neither is located on or near a State or federal highway. There is no evidence that either facility has ever tried to attract interstate travelers as such, and the location of the facilities is such that it would be in the highest degree unlikely that an interstate traveler would break his trip for the purpose of utilizing either establishment." 263 F. Supp. 412, 418.

---

[2] The District Court held hearings and made findings concerning Lake Nixon and another establishment, Spring Lake, in a single trial. No appeal was taken from the District Court's decision holding that Spring Lake was not covered by the Act.

The foregoing finding is not impaired by this additional statement of the District Judge:

> "Of course, it is probably true that some out-of-State people spending time in or around Little Rock have utilized one or both facilities." *Ibid.*

In the first place the court's statement that "it is probably true" takes this out of the category of a finding of fact; and secondly, "out-of-State people spending time in or around Little Rock" who happened to visit Lake Nixon would certainly not be the kind of "interstate travelers" doing the kind of interstate traveling that would "affect" interstate commerce.

The Court of Appeals, affirming the findings of the District Court, said:

> "There is no evidence that any interstate traveler ever patronized this facility, or that it offered to serve interstate travelers . . . ." 395 F. 2d 118, 127.

This Court rejects these joint findings of the two courts below in this way. Referring to advertisements of Lake Nixon in a monthly magazine distributed at Little Rock hotels, motels, and restaurants, to radio announcements, and to advertisements in the "Little Rock Air Force Base," this Court says:

> "Thus, the Lake Nixon Club unquestionably offered to serve out-of-state visitors to the Little Rock area. And it would be unrealistic to assume that none of the 100,000 patrons actually served by the Club each season was an interstate traveler."

In the above statement this Court jumps from the fact that there were an estimated number of admissions onto the club premises during a season to the conclusion that some one or more of these was an "interstate traveler" and that the owners of the premises, Mr. and Mrs. Paul, were bound to know that there were interstate travelers

present.[3]  That conclusion is far too speculative to be used as a means of rejecting the solemn findings of the two courts below.  If the facts here are to be left to such "iffy" conjectures, one familiar with country life and traveling would, it seems to me, far more likely conclude that travelers on interstate journeys would stick to their interstate highways, and not go miles off them by way of what, for all this record shows, may well be dusty, unpaved, "country" roads to go to a purely local swimming hole where the only food they could buy was hamburgers, hot dogs, milk, and soft drinks (but not beer).  This is certainly not the pattern of interstate movements I would expect interstate travelers in search of tourist attractions to follow.

(B) The second prong of the test to determine applicability of the Act to Lake Nixon is whether a "substantial portion" of the hamburgers, milk, and soda pop sold there had previously moved in interstate commerce. The Court's opinion generously concedes that the record is "not as complete on this point as might be desired . . . ."  This is certainly no exaggeration.  In fact, I would go further and agree with the two courts below that the record is totally devoid of evidence to show that a "substantial portion" of the small amount of food sold had previously moved in interstate commerce.  The District Court found as follows on this point:

> "Food and soft drinks are purchased locally by both establishments.  The record before the Court does not disclose where or how the local suppliers obtained the products which they sold to the establishments.  The meat products sold by defendants may or may not have come from animals raised, slaughtered, and processed in Arkansas.  The bread

---

[3] In fact, Mr. Paul testified under oath that no interstate travelers were members of the "club," that they had not invited any to join, and that as far as he knew, none had ever used the premises.

used by defendants was baked and packaged locally, but judicial notice may be taken of the fact that the principal ingredients going into the bread were produced and processed in other States. The soft drinks were bottled locally, but certain ingredients were probably obtained by the bottlers from out-of-State sources." 263 F. Supp., at 418.

Fact-findings on serious problems like this one, which involves marking the jurisdictional authority of State and Nation, should not be made on the basis of "judicial notice" and on probabilities not based on evidence. The Court of Appeals approved this finding of the District Court that a substantial part of the food served at Lake Nixon had not previously moved in interstate commerce. The Court of Appeals said:

"With regard to whether a substantial portion of the food which Lake Nixon serves has moved in commerce, the trial court found that food and soft drinks were purchased locally by the Club but noted that the record before the court did not disclose where or how the local suppliers obtained the products. The court further observed that the meat products sold by the defendants may or may not have come from animals raised, slaughtered, and processed in Arkansas. It also made an observation that the bread used in the sandwiches was baked and packaged locally but took judicial notice that the principal ingredients going into the bread were produced and processed in other states. This observation on the part of the court, however, was entirely voluntary, and the ingredients in the bread would not constitute a substantial part of the food served. We might add that it is a matter of common knowledge that Borden's of Arkansas, which the record shows supplied the milk, obtains the unprocessed

milk for its local plant from Arkansas dairy farmers."
395 F. 2d, at 124.

Finally, the Court mentions, almost as an afterthought,
Lake Nixon's 15 paddle boats leased from an Oklahoma
company on a royalty basis. As to these paddle boats
the Court of Appeals said: "It is common knowledge that
annually thousands of this type boat are manufactured
locally in Arkansas, and there is no evidence whatsoever
that any of the equipment moved in interstate com-
merce." 395 F. 2d, at 125.

The Court's opinion also mentions a juke box leased
by Lake Nixon from the juke box's local owner. The
Court apparently refers to this juke box on the premise
that playing music and dancing makes an establishment
the kind of place of "entertainment" that is covered by
§ 201 (b)(3) of the Act.[4] The Court of Appeals pointed
out that Senator Magnuson, floor manager of this part
of the Act, said that dance studios would be exempt
under the Act. 110 Cong. Rec. 7406. Also, Senator
Humphrey, a leading proponent of the measure, said:

> "The deletion of the coverage of retail establishments
> generally is illustrative of the moderate nature of
> this bill and of its intent to deal only with the prob-
> lems which urgently require solution." 110 Cong.
> Rec. 6533.

---

[4] "(b) Each of the following establishments which serves the
public is a place of public accommodation within the meaning of
this title if its operations affect commerce, or if discrimination or
segregation by it is supported by State action:

. . . . .

"(3) any motion picture house, theater, concert hall, sports arena,
stadium or other place of exhibition or entertainment;"

An establishment affects commerce within the meaning of this sub-
section if, according to § 201 (c) the Act, "it customarily presents
films, performances, athletic teams, exhibitions, or other sources
of entertainment which move in commerce . . . ."

See also *Miller* v. *Amusement Enterprises, Inc.,* 394 F. 2d 342.

It seems clear to me that neither the paddle boats nor the locally leased juke box is sufficient to justify a holding that the operation of Lake Nixon affects interstate commerce within the meaning of the Act.  While it is the duty of courts to enforce this important Act, we are not called on to hold nor should we hold subject to that Act this country people's recreation center, lying in what may be, so far as we know, a little "sleepy hollow" between Arkansas hills miles away from any interstate highway.  This would be stretching the Commerce Clause so as to give the Federal Government complete control over every little remote country place of recreation in every nook and cranny of every precinct and county in every one of the 50 States.  This goes too far for me.[5]  I would affirm the judgments of the two courts below.

---

[5] In my opinion in *Atlanta Motel* v. *United States,* 379 U. S. 241, 268, which also applies to *Katzenbach* v. *McClung,* 379 U. S. 294, concurring in the Court's decision upholding the application of this Act to an Atlanta, Georgia, motel and a Birmingham, Alabama, restaurant, I said:

"I recognize that every remote, possible, speculative effect on commerce should not be accepted as an adequate constitutional ground to uproot and throw into the discard all our traditional distinctions between what is purely local, and therefore controlled by state laws, and what affects the national interest and is therefore subject to control by federal laws.  I recognize too that some isolated and remote lunchroom which sells only to local people and buys almost all its supplies in the locality may possibly be beyond the reach of the power of Congress to regulate commerce, just as such an establishment is not covered by the present Act." 379 U. S., at 275.