**B. Tartt BELL, Hon. Frank Church, Hon. Robert P. Griffin, Rev. Richard C. Halverson, Kenneth O. Johnson, Hon. Nicholas Johnson, M. Cecil Mackey, Robert C. Pierpoint, Charles Roberts and Lyman C. Wynne**

v.

**KENWOOD GOLF AND COUNTRY CLUB, INC., a Delaware corporation, Donal L. Chamberlin, Wilber Jackson Reed, Chairman, Board of Governors, Kenwood Golf and Country Club, Inc.**

Civ. No. 20568.

United States District Court,
D. Maryland.
May 13, 1970.

Gerald P. Norton, Washington, D. C., and Aaron Schreiber, Baltimore, Md., for plaintiffs.

Joe M. Kyle, Silver Spring, Md., for defendants.

**THOMSEN, Chief Judge.**

Plaintiffs are members of Kenwood Golf and Country Club, the facilities of which are located in Montgomery County, Maryland.[1]

Defendants are: Kenwood Golf and Country Club, Inc., a stock corporation incorporated in Delaware and authorized to do business in Maryland, which owns the Club property and operates the Club for a profit; Donal L. Chamberlin, President and principal stockholder of the Corporation; and Wilber Jackson Reed, Chairman of the Board of Governors of the Club.[2]

Plaintiffs seek a declaratory judgment that defendants' policy of prohibiting, preventing and discouraging members from bringing American Negroes to the Club as their guests violates the Constitution and laws of the United States; and an injunction prohibiting defendants, their officers, agents, servants, employees and those in active concert with them from prohibiting, preventing and discouraging members from bringing any guest to the Club based upon the race, religion or national origin of the guest;[3] and requiring defendants to permit plaintiffs to bring guests to the Club subject only to limitations applicable to all guests.

Plaintiffs rely upon (a) the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a, (b) the Thirteenth Amendment, (c) the Fourteenth Amendment, and (d) the contractual relationship between the Corporation and plaintiffs as members of the Club.[4]

The parties have stipulated that Kenwood Golf and Country Club is a public accommodation affecting commerce within the meaning of Title II of the Civil Rights Act of 1964. Defendants claim, however, that it is a "private club" within the meaning of 42 U.S.C.A. § 2000a(e) and therefore exempt from the provisions of the Act with respect to public accommodations.

The case has been submitted for final decision on a stipulation, answers to interrogatories, numerous exhibits and an affidavit. Briefs have been filed and counsel have been heard. There is little or no dispute about the facts.

### Findings of Fact

1. The Club was established at its present location in 1928 in connection

---

1. Plaintiffs allege that they are suing on behalf of themselves and all other members of the Club as a class, but they have taken no steps to comply with the provisions of Rule 23(c), F.R.Civ.P. No member of the Club has sought leave to intervene either as a party plaintiff or as a party defendant.

2. In the complaint plaintiffs allege that they are members of Kenwood Golf and Country Club, Inc., and otherwise understandably confuse the Club and the Corporation, which have the same name. The Delaware Certification of Incorporation shows that "Inc." is not part of the Corporation's name. Plaintiffs are not stockholders of the Corporation; they are members of the Club. The distinction between the Club and the Corporation is important and is maintained in the Rules and the Rules of Operation.

3. The prayer of the complaint refers to race, religion or national origin, but the evidence shows no restriction on guests for any reason except that they are American Negroes.

4. This Court has jurisdiction over claims (a), (b) and (c) under one or more of 42 U.S.C. §§ 2000a–6; 28 U.S.C.A. §§ 2201, 2202, and 1343, and possibly under 42 U.S.C. §§ 1983 and 1988; and of (d) under the doctrine of pendent jurisdiction. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There is sufficient substantiality of one or more of the federal issues to permit this Court to hear the whole case.

with the development of the Kenwood subdivision by the Kennedy-Chamberlin Development Company, as part of the community of Kenwood.

2. All or most of the persons who bought lots or houses in the Kenwood subdivision about the time the Club was founded were offered membership in the Club without initiation fee and with one year's free dues, subject to approval for membership by the Admissions Committee of the Club.

3. The Development Company established covenants applicable to the Kenwood subdivision prohibiting sale to or occupancy by persons not of the Caucasian race.

4. Then, as now, it was the policy of the Club to prohibit its members from bringing American Negro guests to the Club. At the time of the establishment of the Club, that was also the policy of other country clubs in the Washington metropolitan area.

5. The original club house and golf course and some of the other facilities of the Club were constructed by the Development Company with its own funds and borrowed funds. The borrowed funds were repaid from income of that company, including dues of members of the Club.

6. The defendant Corporation was incorporated in Delaware in 1951, with broad powers, and acquired title to the Club property. Defendant Chamberlin was and is its president and principal stockholder. Since 1951 all facilities have been constructed from income of the Corporation and borrowed funds, which, in turn, have been repaid from the Corporation's income, including initiation fees and dues of members of the Club.

7. The facilities include an 18-hole golf course, tennis courts, swimming pools, bowling alleys, dining rooms, bars, meeting rooms, a guest area with 54 sleeping rooms and a large club house.

8. The Club has 2,729 members. Initiation fees for members (other than juniors, non-residents, clergy and honorary members, who total about 900) range from $600 to $1,500 depending upon classification. Dues range from $23 to $38 per month.

9. The Corporation is run for profit, makes a profit, and pays substantial federal and state income taxes, as well as substantial salaries.

10. The meeting room and guest rooms are used not only by members and their guests, but to a large extent by organizations "sponsored" by members, for various kinds of gatherings.

11. The Club has reciprocal arrangements with 21 other clubs throughout the country; but if a Negro member of one of those clubs sought to use the facilities of the Club, he would be turned away by the employees of the Corporation who man the desk.

12. The printed Rules of the Club distributed to members and the Rules of Operation referred to therein state that the operation of the Club is carried on by three separate units: (1) the Corporation, (2) the Executive Committee, and (3) the Board of Governors.[5] The

---

5. The Rules provide:
   The Corporation, acting through its officers and directors elected by its stockholders, "has unrestricted control of the property and has the final decision in any and all matters concerning said property and its use and control as a Club. The Corporation has complete and undisputed authority in all matters affecting its financial status".
   The Executive Committee, composed of either present and past chairmen of the Board of Governors "shall (1) act as an advisory committee to the Corporation and the Board of Governors; (2) investigate and report to the Corporation and the Board concerning matters pertaining to the Club as a whole; (3) resolve any charges filed with it against a member or members; (4) establish and maintain an Admissions Committee which shall act upon all applications for membership in the Club; and (5) consider and make recommendations on such other matters as may be referred to it by the Corporation, the Board or any member".
   The Board of Governors "shall consist of not more than seventeen (17) mem-

members elect the Board of Governors from nominees approved by a Nomination and Election Committee established by the Board of Governors, on which the Corporation is represented. The Rules provide that the Board "will be equally cognizant of the interests of individual members and of the Corporation, and shall at all times endeavor through its actions to promote Club spirit and activity."

13. The policy not to permit members to bring American Negro guests to the Club is not included in the Rules of the Club distributed to the members.[6] The evidence does not show that the policy was ever adopted or approved by the members or expressly adopted by the Board of Governors. There is no practicable way in which the members can obtain a vote to change it.

14. The Rules of Operation can be amended only with the consent of the Corporation as well as of the Executive Committee and the Board of Governors of the Club.

15. With respect to the admission of new members, existing members have no right to vote or blackball. A substantial majority of persons who apply are eventually accepted. Such numerical limitations as exist on the number of members of the various classes are based only upon the capacity of the Club's facilities. Existing members are given no notice as to the proposed expulsion of a member, and have no vote on expulsion.

16. An application for an alcoholic beverage license for the Club submitted in 1938 indicated, in response to a question on the application form, that the Club would serve "white only". In all subsequent applications for renewal of the license it was indicated in response to a question on the form that there had been no change in the answer to that question. The individual licensees have

---

bers, fifteen (15) of whom shall be elected by the membership at large, the Chairman of Ladies' Golf, and one who shall represent the Corporation". There are standing Committees and Rules for the various activities in which the members engage.

6. The Rules contain various provisions and limitations with respect to guests but contain no reference to race, religion or national origin. The Rules contain the following provisions, inter alia:

"Guests

"All guests must be registered at the facility which he shall use and be in the company of the sponsoring member. The member shall be responsible for the conduct of his guest and for all charges incurred by him.

"Unless guest limitations are provided by the Board of Governors, sponsored guests may have the privileges of use of the golf course, swimming pools, tennis courts and bowling lanes upon the payment of prevailing fees provided however that no guest may be sponsored more than twice in any one month and no member shall be entitled to have more than three guests for golf or tennis on any one day.

"During tournaments, entrants may have the privilege of use of the Club House, Golf Course, Swimming Pools, Tennis Courts or Bowling Lanes if ar-

ranged for by the respective club committee in charge.

"A member may sponsor a guest living beyond the 30 mile limitation as a non-resident guest for a period of 30 days. The member must secure a privilege card which shall entitle his guest to the use of club facilities by paying the prevailing fees."

"Tennis Rules"

" *   *   *

"Guests

"All guests must first be registered at the Club Office by sponsoring member, and with the Tennis Professional before going on the courts. A member may sponsor only three guests on any one day. No person may be introduced as a guest more than twice in any month. Guest fees will be as established by the Management. No guest may play if less than four courts are playable because of weather conditions."

"Guest House Rules

"Guest rooms are available to all members of the Club and their guests. All guests must be registered at the Club Office.

" *   *   *

"Any guest occupying a room does so with the full understanding that if he is objectionable to other guests or the Manager on duty he will be forced to leave the premises. *   *   *"

been officers of the Corporation. Defendant Chamberlin has at times been one of the licensees. The Corporation and the Club have obtained other necessary licenses and permits for the Club's activities.

17. The Corporation has obtained various favorable zoning rulings from the County authorities, and has taken advantage of the property tax assessment provisions applicable to country clubs contained in Article 81, § 19(e), of the Annotated Code of Maryland (1957), 1969 Replacement Volume.

18. Various facilities of the Club, such as the golf course, tennis courts, swimming pools and meeting rooms, are provided elsewhere in Montgmonery County by other clubs and by state, local or other public agencies.

19. In early 1968 the wife of one of the plaintiffs was arranging to have the annual meeting of the Wellesley College Alumnae Association held at the Club under her sponsorship. While discussing arrangements with the Secretary of the Corporation, she mentioned that the speaker was to be the Mayor-Commissioner of the District of Columbia, Walter E. Washington, and was told by the Secretary of the Corporation that the Club would not accommodate the meeting because Mayor Washington is a Negro. The meeting was held elsewhere.

20. As a result of this incident, many members discovered for the first time that the Club had such a guest policy. A group of members, including some of the plaintiffs, began a quiet effort to persuade the Corporation and other governing bodies of the Club to change that restrictive policy. Those efforts were repeatedly rebuffed. The group then asked to meet with the Board of Governors, but the Board refused. The Chairman of the Board of Governors stated that the racially re-

strictive guest policy was favored by "the vast majority of our members", a conclusion later admitted to be based on his own belief. The group then asked that the members be polled, but that request was refused. Defendants also refused the group access to a list of their fellow members for use in conducting their own poll. Relying upon their personal contacts, the group obtained in a few weeks' time the signatures of several hundred members on petitions requesting the Club to permit members to bring guests without regard to race. A number of members resigned because of disagreement with the Club's policy.[7]

### Discussion and Conclusions

■ I. As noted above, it is stipulated that the Club is a public accommodation affecting commerce, within the meaning of Title II of the Civil Rights Act of 1964, but defendants claim that it is a private club within the meaning of 42 U.S.C. 2000a(e) and therefore the provisions of the Act with respect to public accommodations do not apply.

Most of the cases dealing with such a claimed exemption have involved patent shams, such as United States v. Beach Associates, Inc., 286 F.Supp. 801 (D. Md.1968). No case involving a set of facts similar to the facts of this case has been cited or found. Several authorities binding on this Court, however, have discussed the principles which must be considered. Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969); Nesmith v. YMCA, 397 F.2d 96 (4 Cir. 1968).

In Daniel v. Paul, the Supreme Court said: " * * * Lake Nixon is not a private club. It is simply a business operated for a profit with none of the attributes of self-government and member-ownership traditionally associated

---

7. Those resigning included Secretary of State William P. Rogers, Secretary of Defense Melvin R. Laird, former Postmaster General Edward Day, Bishop William Creighton, and the President of George Washington University, Lloyd El-
liot. Various groups also decided not to use the Club's facilities because of that policy, including the Montgomery County Bar Association and the Bethesda-Chevy Chase Chamber of Commerce.

with private clubs". 395 U.S. at 301, 89 S.Ct. at 1699.

This Court does not read Daniel v. Paul or any other decision as holding that the absence of either self-government or member-ownership is necessarily fatal to a claim that an establishment is a private club irrespective of the total facts. In this case the Corporation, not the members, owns the property and operates the Club for profit. The members, through the Board of Governors and the various standing committees have some share in the government of the Club and its activities, but important aspects of the government and activities of the Club are reserved to the Corporation. The cases cited above, and the authorities cited therein,[8] lead this Court to conclude that under the totality of the facts found above, Kenwood Golf and Country Club is not a private club within the exemption provided by § 2000a(e).

■ II. The application for membership in the Club states: "I make this application with a complete understanding and acceptance of the terms, conditions, privileges and restrictions governing the class of membership applied for; and with the further understanding that the dues, fees and rules governing membership may be changed upon reasonable notice." The Rules of the Club, furnished to the members, do not include any restrictions with respect to the race, religion or national origin of guests, although they contain limitations on the use of Club facilities by guests. See Finding 13 and footnote 6, above. The contract between the members of the Club and the Corporation, to which each member pays his dues, embodied in the application and the Rules, gives members the right to bring guests to the Club and contains no provision justifying defendants' refusal to permit a member to bring an American Negro guest under circumstances where a white guest would be permitted.

III. The Court does not hold that this result is required by the Thirteenth Amendment,[9] and intimates no opinion with respect to the various Fourteenth Amendment points which were raised by plaintiffs.

The Court will enter a declaratory judgment and an injunction giving effect to these rulings. Counsel should agree upon a proper judgment and injunction and present it to the court in five days.

---

8. Including Note, 54 Georgetown Law · Journal 915 (1966).

9. Cf. Jones v. ·Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Sullivan v. Little Hunting Park Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed. 2d 386 (1969).